UNITED STATES v. ALLEN et al.†

(Circuit Court of Appeals, Eighth Circuit. June 8, 1910.)

Nos. 3150–3163, 3265, 3276, 3279.

1. INDIANS (§ 15*)—LANDS—RESTRICTION ON ALIENATION BY ALLOTTEES—RIGHT OF UNITED STATES TO ENFORCE BY SUITS.

The plan of the United States government in dissolving the Five Civilized Tribes of Indians and distributing their lands in severalty was a great governmental project, having for its object the social and industrial advancement of the Indians, and the various acts pertaining thereto must be construed in consonance with such purpose and not merely as real estate transactions. The relation of the government to the Indians is not to be measured by the law governing the ordinary relation of guardian and ward, nor are the limitations imposed on the alienation of land governed by the strict rules of law relating to grantor or grantee, but the United States, by virtue of its peculiar relationship to the Indians and to prevent the policy to be worked out through such legislation from being defeated may enforce such restrictions on alienation in the courts although retaining neither a legal nor an equitable estate in the lands after the allotment.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 39; Dec. Dig. Dig. § 15.*]

2. INDIANS (§ 15*)—LANDS—RIGHT OF UNITED STATES TO MAINTAIN SUITS—CONSTRUCTION OF STATUTE.

The provision of Act May 27, 1908, c. 199, § 6, 35 Stat. 314, that "nothing in this act shall be construed as a denial of the right of the United States to take such steps as may be necessary including the bringing of any suit * * * to acquire or retain possession of restricted Indian lands * * * in cases where deeds, leases or contracts * * * have been or shall be made contrary to law with respect to such lands prior to the removal therefrom of restrictions upon the alienation thereof, such suits to be brought on the recommendation of the Secretary of the Interior, without costs or charges to the allottees the necessary expenses incurred in so doing to be defrayed from the money appropriated by this act" is more than a saving clause and when read in connection with the part of the section appropriating $50,000 to cover the expenses incurred in such litigation is an implied grant of power to maintain such suits

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied August 20, 1910.

and such power extends to suits relating to allotments which were freed from restrictions by section 1 of the act in respect to conveyances or contracts previously made.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 39; Dec. Dig. § 15.*]

3. STATUTES (§ 185*)—CONSTRUCTION—IMPLIED PROVISIONS.

That which is implied is as much a part of a statute as that which is expressed.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 264; Dec. Dig. § 185.*]

4. STATUTES (§ 217*)—CONSTRUCTION—EXTRINSIC EVIDENCE TO AID CONSTRUCTION.

The effect of a statute actually passed by Congress cannot be narrowed by reference to a bill which was never voted on, but was merely proposed in committee.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 293; Dec. Dig. § 217.*]

5. INDIANS (§ 31*)—PROTECTION OF RIGHTS BY UNITED STATES—EFFECT OF GRANTING CITIZENSHIP.

The grant of citizenship to the Indians in Indian Territory by Act Feb. 8, 1887, c. 119, 24 Stat. 388, as amended by Act March 3, 1901, c. 868, 31 Stat. 1447, was intended for their protection, and was not a renunciation by the United States of the authority which it had always exercised to adopt such measures as in its judgment were wise for the protection of the Indian in his rights.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 23; Dec. Dig. § 31.*]

6. INDIANS (§ 15*)—SUITS RESPECTING LANDS—PARTIES.

To a suit brought by the United States under the authority conferred by Act May 27, 1908, c. 199, § 6, 35 Stat. 314, to set aside a deed, lease, or contract made by an Indian allottee in violation of the statutory restrictions on alienation, the allottee is not an indispensable party.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 39; Dec. Dig. § 15.*]

7. PARTIES (§ 51*)—INDISPENSABLE PARTIES—RULE GOVERNING.

It is not the mere convenience of the parties before the court that renders absent parties indispensable, but the protection of the rights of those absent parties.

[Ed. Note.—For other cases, see Parties, Cent. Dig. §§ 76, 77; Dec. Dig. § 51.*]

8. EQUITY (§ 150*)—PLEADING—MULTIFARIOUSNESS OF BILL.

A bill filed by the United States to cancel a large number of separate conveyances made by individual Indian allottees to the several defendants as invalid, because made in violation of a statute imposing restrictions upon the alienation of the land by the Indians, is not multifarious.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 371–379; Dec. Dig. § 150.*]

9. INDIANS (§ 31*)—RESTRICTION ON POWER TO ALIENATE LAND—POWER OF CONGRESS TO EXTEND.

It is within the power of Congress to enlarge the period within which an Indian allottee is prohibited from alienating his land beyond that imposed when the allotment was made, so long as the land is held by the allottee, although in the meantime he may have been made a citizen.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 23; Dec. Dig. § 31.*]

Adams, Circuit Judge, dissenting.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeals from the Circuit Court of the United States for the Eastern District of Oklahoma.

These were seventeen suits in equity by the United States against James P. Allen and others, N. E. Patterson and others, Charles E. McPherren and others, F. B. Severs and others, Wilson Bruton and others, Norman Pruitt and others, James Jefferson and others, J. J. Creamer and others, Felix R. Phillips and others, J. M. Dickenson and others, James P. Allen and others, Walter F. Nichols and others, John F. McClellan and others, Alfred F. Goat and others, George C. Crump and others, C. J. Benson and others, and J. O. Davis and others. Decrees for defendants (171 Fed. 907), and complainant appeals. Reversed.

Charles W. Russell, Asst. Atty. Gen., for the United States.

S. T. Bledsoe, George S. Ramsey, B. B. Blakeney, James E. Humphrey, Joseph C. Stone, and Robert L. Owen, pro se (A. W. Clapp, O. L. Rider, Kenneth S. Muchison, Wm. M. Matthews, C. L. Thomas, N. A. Gibson, Robert J. Boone, George C. Butte, Garfield Johnson, T. S. Cobb, Crump, Rogers & Harris, Willmott & Wilhoit, W. L. McCann, Thomas H. Owen, W. B. Crossan, and Davis & Davis, on the briefs), for appellees.

Before HOOK and ADAMS, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. The lands of the Five Civilized Tribes were allotted in severalty to their members, subject to express restrictions against their alienation for specified periods of time. The bills in these suits charge that many thousand conveyances have been made in violation of those restrictions, and the suits have been brought by the United States to have some 4,000 of these conveyances declared to be void and canceled of record. The restrictions against alienation arise out of numerous statutes and treaties, and vary according to such matters as the amount of Indian blood of the allottee, whether the land was a homestead, and whether it was held as an original allotment or by inheritance. The grantees under the conveyances are classified according to some distinct feature of the restriction upon alienation, and all grantees coming under each class are combined as defendants in a single suit. The allottees are not made parties either as plaintiff or defendant, and it is not charged in the bills that the conveyances were obtained by fraud, misrepresentation, or for an inadequate consideration. They are assailed solely upon the ground that they were made in violation of the restriction which Congress imposed upon the alienation of the allotments.

These bills were demurred to upon numerous grounds. The demurrers were sustained by the trial court for the reason (1) that the complainant has not such an interest in the matters involved as entitles it to maintain the action; (2) that the allottees are necessary parties, and that there is therefore a defect of parties; (3) that the bills are multifarious. A decree was entered in each case dismissing the bill upon the merits, to review which is the object of this appeal.

The consideration of the case will be simplified if it is understood

at the outset that the plan of the government, in dissolving the five civilized nations and distributing their lands in severalty, was not simply a real estate transaction. It was a great governmental project, having for its object the social and industrial elevation of the Indians. For the accomplishment of, that result there were two main reliances: (1) The added incentive which comes from the individual ownership of property as distinguished from its joint or tribal ownership; (2) the continuance of that ownership for such a period as should bring the Indian into a state where he could safely be trusted to protect his interests in the sharp competition with members, of the white race. During all the years that this scheme was in process of execution, the Indian lands, like the Indians themselves, were subject to the supreme authority of the national government. The United States proceeded, in so far as it could, with the consent of the Indians. That, however, it did as a matter of wise governmental policy, and not in obedience to any constitutional restriction. Whenever it encountered the obstinate opposition of the Indians to its plans, it did not hesitate to set aside their will and substitute its own authority. The title to these lands was in the Indian tribes, and the formal conveyances to the individual members were made by tribal officers. All this, however, was done in obedience to the regulations of the national government. To attempt to cramp these large governmental measures to the narrow limits of a real estate transaction is to deprive them of their distinctive character. And yet much of the argument contained in the briefs, as well as the opinion of the trial court, treats these measures as a matter between grantor and grantee, and, wherever they do not fit the private law of real property, they are declared to be ineffective.

The same observations may be made as to the statement of the relation between the national government and the Indians being that of guardian and ward. These are familiar terms in decisions dealing with Indian matters. They are, however, words of illustration, and not of definition, and to attempt to reason from the private law of guardian and ward to the measures of the federal government in dealing with the Five Civilized Tribes leads only to confusion and the subversion of the real scheme of government.

Turning now to the objections which were made and sustained by the trial court, has the federal government such an interest as entitles it to maintain these suits? It will be conceded at the outset that it has no legal or equitable estate in the allotments; and if such an estate is necessary, it has no standing in court. It is, however, too plain for controversy, that the federal government imposed restrictions upon the alienation of these allotments. That restriction was its main reliance for the social and industrial elevation of the Indians. Has it a standing in court for the enforcement of its policy? To say that it has not is to make the restraints upon alienation a mere brutum fulmen. Shall the Indians who are intended to be restrained, be made the sole agency for the enforcement of the restraint? If so, the act of Congress is nothing more than a benevolent admonition. If they are unable to resist the allurements by which they are enticed into making the conveyances, will they be expected to undertake the difficult and protracted litigation necessary to set aside their own acts?

To ask these questions is to answer them. Congress intended that both the Indians and the members of the white race should obey its limitations. A transfer of the allotments is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States. If these Indians may be divested of their lands, they will be thrown back upon the nation a pauperized, discontented, and, possibly, belligerent people. To prevent such results the United States may invoke the aid of its courts. That question was put to rest in the decision of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092. When a suit in equity is an appropriate method for the enforcement of a governmental policy, the national government may maintain such a suit. The present case presents a right of the nation which has been violated and cannot be redressed in any other way than by a suit in equity. If its interest in its measures does not give it a standing in court, then the violation of those measures must go wholly without redress. Governmental action cannot be thus paralyzed. If the aid of the court is an appropriate remedy, the government has the same right to proceed in that manner that it has to use executive power where that power is an appropriate agency for the accomplishment of its purposes.

The 'Supreme Court of the United States in the case which carried the emancipation of the Indians and their property to the fullest extent, expressly recognizes the right of the government to enforce, by appropriate action in court, the restraints which it imposed upon the alienation of Indian allotments. The court says in the Heff Case, 197 U. S. 489, 509, 25 Sup. Ct. 512, 49 L. Ed. 848:

"Undoubtedly an allottee can enforce his right to an interest in the tribal or other property (for that right is expressly granted), and equally clear is it that Congress may enforce and protect any condition which it attaches to any of its grants. This it may do by appropriate proceedings in either a national or state court. * * * Many a tract of land is conveyed with conditions subsequent. A minor may not alienate his lands; and the proper tribunal may at the instance of the rightful party enforce all restraints upon alienation."

Under the general allotment act of 1887, a provisional patent was issued to the allottee, and the naked legal title retained in the government for the period of 25 years. In the case of the Five Civilized Tribes, this plan was modified to the extent of granting the legal title to the Indian, but imposing upon it a restraint against alienation. These plans present simply differences of method. The object sought in each case was the same, namely, to clothe the Indian with such title to the property as seemed best calculated to encourage his industrial development, and yet accompany this grant with such a restriction as would prevent the main reliance of the government for the industrial betterment of the Indian from being defeated by the alienation of the property. The right of the government to invoke the aid of its court to prevent the defeat of its object is the same under the one statute as the other. Its right to maintain a suit to prevent the defeat of its allotment scheme under the general law of 1887, is fully sustained in United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532. It is contended, however, in the present case, that that decision

179 F.—2

is not controlling because there the government held the legal title to the property for a period of 25 years in trust for the Indian, whereas here the legal title has been conveyed to the Indian, but subject to a restraint upon alienation. The decision in the Rickert Case does not rest upon a principle of the law of real property, but upon the power of the nation to enforce its own measures. At page 444 of the opinion 188 U. S., at page 478 of 23 Sup. Ct. (47 L. Ed. 532), the right of the government to maintain the suit is declared to rest, not upon the fact that it held the title to the property, but, to use the language of the court, upon "the injurious effect of the assessment and taxation complained of upon the plans of the government with reference to the Indians." In either case it is not a right of property which is enforced, but a plan of government. The Supreme Court there declares the right of the nation to maintain a suit for the enforcement of its policy in regard to Indian allotments to be too plain for argument. 188 U. S. 444, 23 Sup. Ct. 478, 47 L. Ed. 532. This statement is approved in McKay v. Kalyton, 204 U. S. 458, 467, 27 Sup. Ct. 346, 51 L. Ed. 566.

But we are not left to inference from the general scheme of the national government in its dealings with the Five Civilized Tribes, to find authority for the maintenance of these suits. They are authorized by express act of Congress. The last paragraph of section 6 of the act of May 27, 1908, c. 199, 35 Stat. 312, is a saving clause. Viewed solely in that light it declares the belief and intent of Congress that the rights which it saves, exist. It does not, however, stop with the language which saves the rights specified, but proceeds to declare the conditions upon which those rights shall be exercised by stating that the suits shall be brought upon the recommendation of the Secretary of the Interior, and without cost to the allottees. It thus passes beyond the scope of a saving clause, and uses language which is consistent only with the grant of the power to institute the suits. When this language is read in connection with the earlier part of the section appropriating $50,000 to cover the expenses incurred by the Attorney General in this litigation, the intent of Congress, that the power to maintain the suits is granted, and its purpose that such suits should be instituted in proper cases, is clearly manifest. It is incredible that the purpose of Congress was simply to provide for the institution of suits to obtain a judicial determination as to whether the power of the government to maintain such suits existed. Congress by its own declaration could have placed that question beyond controversy, and the courts ought not to give a meaning to its acts which would make of them a mere squandering of public funds. That which is implied is as much a part of a statute as that which is expressed. City of Little Rock v. U. S., 103 Fed. 418, 43 C. C. A. 261; United States v. Babbit, 1 Black, 55, 17 L. Ed. 94. Implications, far less clear than the power to maintain these suits, have been enforced by the courts. Gelpcke v. City of Dubuque, 1 Wall. 220, 17 L. Ed. 530; Postmaster General v. Early, 12 Wheat. 136, 146, 6 L. Ed. 577; Telegraph Company v. Eyser, 19 Wall. 419, 22 L. Ed. 43; Great Northern Railway Co. v. United States, 155 Fed. 945, 84 C. C. A. 93. The trial court held that because a statute conferring the jurisdiction here in question by more direct language was not enacted, though brought to the

attention of the committee having the present act in charge, that this amounted to an expression of the legislative intent that the right itself either did not exist or was so doubtful that the only proper procedure was to make provision for a judicial determination of its existence. Courts can find the intent of the Legislature only in the acts which are in fact passed, and not in those which are never voted upon in Congress, but which are simply proposed in committee. It is not contended that the bill referred to was ever brought to a vote in Congress and rejected. It was simply one of the measures which was under consideration at the time the act of May 27, 1908, was passed. To hold that such facts can be looked to for the purpose of narrowing the effect of a statute actually passed, would be to invent a new and dangerous canon of statutory interpretation.

Much of the briefs is devoted to arguments deduced solely from the fact that Congress has conferred national citizenship upon the Indians. These arguments have been frequently presented to the courts, but so far as we are aware, they have never defeated the exercise of national authority over the Indian except in the Heff Case, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848. That decision, however, as now explained by the Supreme Court in United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. ——, lends no support to the defendants. The case arose under the general allotment act of 1887. That statute provides that, upon the completion of the allotments, the Indians "shall have the benefit of, and be subject to the laws, both civil and criminal, of the state." Mr. Justice Brewer carries this feature of the statute through his opinion at every step as the basis of the decision of the court. He has now removed all possible doubt on the subject by his opinion in the Celestine Case, where he expressly states that the Heff opinion rests upon the fact that under the general allotment act Congress has, by direct provision, entirely renounced its own authority over the Indians, and subjected them to the laws of the state, both civil and criminal. The decision of the Heff Case simply gives effect to this positive declaration of the legislative intent. In its dealings with the Five Civilized Nations, Congress has been at great pains to indicate a different purpose. Here it has from time to time, down to the organic act admitting Oklahoma and the provisions which it insisted should be embodied in the Constitution of that state, reserved to itself express authority to pass such laws with respect both to the Indians and their lands, as shall in its judgment seem wise. In the present case, though it conferred citizenship upon the Indians, it accompanied its grant of the allotments to them with an express provision against their alienation. The difference between the present case and the Heff Case is this: In the former case Congress expressly renounced its own authority over the Indians, and subjected them to the laws, both civil and criminal, of the state. Here Congress, with equal explicitness, has imposed a restraint upon the alienation of allotments. It is as much the duty of the courts to give effect to the legislative intent in the present case as in the former. See, also, U. S. v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. ——.

The grant of citizenship to the members of the Five Nations was intended for their protection, and not to strip them of the protection of

the national government. It was, in our judgment, never the intent of Congress to deprive itself of the authority which it had always exercised to adopt such measures as in its judgment were wise for the protection of the Indian in his rights among the more highly developed members of the white race. Conceding the Indians to be citizens of the United States and of the state of their residence, this court still said in the case of United States v. Thurston County, 143 Fed. 287, 288, 74 C. C. A. 425, 426: "Their civil and political status, however, does not condition the power, authority, or duty of the United States to exert its powers of government to control their property, to protect them in their rights, to faithfully discharge its legal and moral obligations to them, and to execute every trust with which it is charged for their benefit. They are still members of their tribes and of an inferior and dependent race." Clothing them with citizenship did not change their character or invest them with full industrial capacity. These records are eloquent on that subject. An intent to destroy the authority of the national government to protect the Indian ought not to be deduced as a mere speculative inference from the definition of citizenship. Such a radical change of national policy should emanate only from express and unequivocal language.

Section 1 of the act of May 27, 1908, removes all restraints upon alienation as to several classes of allotments. Section 6 of that act provides for the appointment of representatives of the Secretary of the Interior to counsel and advise Indian allottees having restricted lands, with reference to the same, and also authorizes these agents to bring suits in the name of the allottee to cancel and annul any conveyance or incumbrance thereof made in violation of any act of Congress. These provisions standing alone would afford a strong implication against the right of the government to maintain these suits in its own name as to lands that are freed from restriction by section 1. The Indian as a citizen of the United States has a clear right to maintain any suit necessary to set aside illegal conveyances of his property. By section 1 of the act he is vested in certain cases with an unrestricted right to dispose of his allotment. How can the Attorney General contend that as to lands thus freed from restriction by the government he is truthfully representing its present policy by prosecuting these suits in its name? Again, it might well be urged that, inasmuch as Congress has authorized the agents of the Secretary of the Interior to maintain suits in the name of allottees to cancel any instrument executed in violation of law, it has thereby indicated its intent that no other governmental agency should institute such suits. These contentions, in our judgment, would be controlling were it not for the last paragraph of section 6 of the act. It reads as follows:

"Nothing in this act shall be construed as a denial of the right of the United States to take such steps as may be necessary, including the bringing of any suit, and the prosecution and appeal thereof, to acquire or retain possession of restricted Indian lands, or to remove cloud therefrom, or clear title to the same, in cases where deeds, leases or contracts of any other kind or character whatsoever have been or shall be made contrary to law with respect to such lands prior to the removal therefrom of restrictions upon the alienation thereof."

"Nothing in this act" includes the provisions from which the implication is drawn against the right of the government to maintain these suits. The later language of the paragraph extends that right to all conveyances which "have been made contrary to law with respect to said lands.prior to the removal therefrom of restrictions upon the alienation thereof." According to the averments of the bills, every conveyance here involved falls clearly within these words. To deny the right of the government to maintain these suits is to repudiate the plain language and manifest object of the paragraph which we have quoted. The Indians and their lands were subject to the supervision of the Secretary of the Interior, and the act provides that the suits shall only be brought on his recommendation. The power of Congress to confer such an authority is beyond question. Whether the suits should be brought presents a question of administrative rather than judicial discretion. If Congress saw fit to reinvest allottees with a clear title to their allotments before freeing them from restraint by section 1 of the act, that is clearly a subject with whose wisdom the courts cannot interfere. It is our duty to give effect to the intent of Congress as declared by the statute. The Supreme Court in the case of United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. ——, again enforces the duty of the courts to construe legislation of Congress in relation to the Indians so as to promote their interest. Applying that canon, we entertain no doubt of the right of the government to maintain these suits. They are brought in the name of the United States to enforce a right created by federal law. The jurisdiction of the Circuit Court is therefore plain.

Is there a defect of parties? The rule as to parties in equity was early stated by Mr. Justice Curtis in language so accurate and comprehensive that it has since been accepted by all federal courts. He says that parties are:

"(1) Formal parties. (2) Persons having an interest in the controversy, and who ought to be made parties in order that the court may act on that rule which requires it to decide on, and finally determine, the entire controversy, and do complete justice, by adjusting all the rights involved in it. These persons are commonly termed necessary parties; but if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties. (3) Persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without either affecting that interest, or leaving the controversy in such a condition that its final termination may be wholly inconsistent with equity and good conscience." Shields v. Barrow, 17 How. 130, 139, 15 L. Ed. 158.

Th Supreme Court in Waterman v. Canal Louisiana Bank Co., 215 U. S. 33, 49, 30 Sup. Ct. 10, 54 L. Ed. ——, after quoting the above language with approval, condenses the rule as to indispensable parties as follows:

"The relation of an indispensable party to the suit must be such that no decree can be entered in the case which will do justice between the parties actually before the court, without injuriously affecting the rights of such absent party."

That is the real ground of the decision of the Supreme Court in Minnesota v. Northern Securities Company, 184 U. S. 199, 22 Sup. Ct. 308, 46 L. Ed. 499. The decree there could not be enforced against the Northern Securities Company without destroying the rights of the Northern Pacific and Great Northern Railroad Companies, and their stockholders, who were not parties. See, also,˙ Rogers v. Penobscott Mining Co., 154 Fed. 615, 83 C. C. A. 380. The allottees in the present case do not come within the class of indispensable parties as thus defined. The cause of action set up in the bill is not theirs but the government's. True, if the government succeeds, their titles will be cleared of clouds˙; but, if it does not succeed, they will be left with their personal causes of action unaffected by what is done in the present litigation. It may be said that this very fact makes the presence of the allottees necessary to complete justice to the defendants. While the measure of justice in their favor would be more complete if the allottees were present, that fact does not render the allottees indispensable parties. It is not the mere convenience of the parties before the court which renders absent parties indispensable, but the protection of the rights of those absent parties. Looking at the entire litigation, justice to the defendants will also be promoted by this practice. The Indians have already parted with their lands by deed. While they have the legal right to assail the conveyances if they were made in violation of the statute against alienation, the exercise of that right by the Indians after a decision against the government in the present suit, is so problematical that it would be oppressive to compel the plaintiff to bring all allottees before the court, and would also add unnecessarily to the costs of the defendants in case the suits shall go against them. Again, the allottees, if present, would have no control over the suits. Their consent to a judgment in favor of the defendants would not defeat the right of the government. In our judgment, therefore, there is no defect of parties.

The defense of multifariousness is without merit. That defense, as the Supreme Court has frequently declared, is "very largely a matter of convenience." United States v. Bell Telephone Co., 128 U. S. 315, 352, 9 Sup. Ct. 90, 91, 32 L. Ed. 450; Graves v. Ashburn, 215 U. S. 331, 335, 30 Sup. Ct. 108, 54 L. Ed. ——. It is addressed to the sound discretion of the court. The convenience both of the defendants and the government is conserved by joining in one action all such conveyances as the government claims are invalid because made in violation of a specific statute.

Only one question remains for consideration. The statutes imposing restraints upon alienation were changed from time to time between the year 1893, when ·the allotment of the lands in severalty began, and the time of their completion some 15 years later. It is earnestly contended by the defendants that after allotments had been made subject to a specific limitation, the government was without power to enlarge the period of that limitation; that the Indian obtained a vested right in his allotment, subject only to the restriction which was imposed upon it at ˙the time the allotment was made, and that to enlarge the period of the restriction would be. an impairment of his vested rights, in violation of the fourteenth amendment to the Constitution. So long

as the lands were held by the Indian allottee, or by an Indian who claimed under him by inheritance, we do not think this contention is sound. The grant of citizenship to the Indian did not destroy the right of the federal government to regulate and restrict his use of these lands. Though a citizen of the United States, he did not cease to be an Indian, and both he and his property remained subject to the national government. Congress has from time to time asserted this authority, and to hold that its enactments in that regard are unconstitutional, would be disastrous to the Indian, and would probably still further confuse the already complicated title to lands in Oklahoma. The extension of the period of restriction under the general allotment act is referred to with approval in U. S. v. Celestine, 215 U. S. 291, 30 Sup. Ct. 93, 54 L. Ed. ——. It is, of course, true that conveyances of allotments to third parties in accordance with the law in force at the time the conveyances were made, could not be impaired by subsequent legislation on the part of Congress enlarging the period of restriction against alienation.

The whole scheme of allotment of lands in severalty to the Indians is an experiment. Congress, in the case of the Five Nations, has attempted to reserve to itself power to deal with the subject in the light of experience. If the plan proves a failure, after a fair trial, it would be disastrous, indeed, if the mere grant of citizenship to the Indian had placed him beyond the power of the federal government to adopt such measures for his welfare as experience should show to be necessary.

The decrees are reversed, and the trial court is directed to proceed with the suits in accordance with the views here expressed.

ADAMS, Circuit Judge (dissenting). I am unable to agree with my Associates that the United States can of its own motion, without the request or consent of the Indians whose rights are involved, maintain these suits to remove a cloud from their title. When the suits were instituted the individual Indians held title in fee simple absolute to their several allotments. The undivided interests which they originally owned in tribal property had been effectually partitioned in the process of allotment provided by the act of March, 1893 (Act March 3, 1893, c. 209, 27 Stat. 612), and subsequent acts supplemental thereto. Any reversionary interest of the United States dependent upon possible abandonment of the land or extinction of the tribe had been relinquished. The United States, therefore, had no proprietary right legal or equitable to protect or safeguard by suit or otherwise. Moreover, the Indians had become citizens of the United States and of the state of Oklahoma, and had become entitled to all the rights, privileges, and immunities of such citizens. As a result of all these things guardianship of the government over them had ceased, and the Indians had become completely emancipated from federal control. Laws restricting alienation, hereafter referred to, had been passed for their protection, but this fact does not militate against the completeness of their emancipation. Matter of Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848.

With no title legal or equitable to protect, and no duty of a trust character to perform, a new head of equity jurisdiction had to be dis-

covered to justify the maintenance of these suits by the government; and this, it is claimed, is found in the obligation of the government to enforce a great national policy. The Debs Case, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, and others of that character are cited in support of this discovery; but they do not, as I understand them, justify governmental intervention, in behalf of private citizens except in the discharge of duties intrusted to the care of the nation by the Constitution. The intervention of the government in the Debs Case appears to be justified· on the ground that power over interstate commerce and the transportation of the mails was vested in the national government by the Constitution. Conceding, however, without admitting, that the government may intervene as complainant to redress the wrongs of a limited number of citizens arising out of matters not committed to its control by the Constitution, I think the national policy with respect to the Five Civilized Tribes is entirely inconsistent with the right or duty of the United States to institute suit in its own name for their benefit. The majority opinion dwells largely upon that part of the Indian policy which prevailed before the cessation of the national guardianship, that part of it which concerned the treatment of the Indians before emancipation, when a duty rested upon the government to protect them and prepare them for citizenship; but that time and that duty have passed away. Congress in its wisdom has determined that the Indians of the Five Civilized Tribes are now fit for citizenship and qualified to perform its duties and carry its responsibilities. It has accordingly modified its former policy to meet the new conditions. It has endowed the Indians with rights and responsibilities intended and calculated to develop self-reliance, independence, and thrift. Citizenship has been conferred upon them and title to lands in fee simple has been vested in them with the expectation that the responsibilities incident thereto—the defense of their rights, the redress of their wrongs, the establishment of homes, the support of themselves and their families, and generally speaking, the practice of the arts of civilized life—may aid them in their social and economic development. In view, doubtless, of the cupidity of men, and of their own natural improvidence, Congress with a view of encouraging and aiding them in their upward progress enacted (35 Stat. 312) that "All allotted lands of enrolled fullbloods, and enrolled mixedbloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one" except by permission of the Secretary of the Interior.

The foregoing considerations, in my opinion, indicate that Congress has adopted a new policy concerning these Indians, namely: the promotion of self-reliance, self-respect, economy, and thrift, and to this end after making the special provision above indicated and perhaps others of like character, has left them otherwise subject to general laws governing all citizens. Equality of opportunity is all an American citizen ought to demand; and this and more in the respects just indicated Congress has given the members of the Five Civilized Tribes. With these special provisions made in their behalf the legislative intent and purpose seems to have been to leave them to justify their

right to citizenship by coping with other citizens in the affairs of life on an equal footing without the expectation or hope of other special governmental intervention. Such intervention in the way of institution of suits at wholesale as done in these cases without the request or consent of the Indians is not only humiliating in itself but tends to defeat the true national policy by discouraging self-reliance and independence of action. The policy of encouraging and aiding the Indians to act for themselves independently, rather than of aggressively interfering without their consent, to assert their statutory rights is distinctly recognized, if not commanded, in section 6 of the act of May 27, 1908, above cited. Section 1 of that act as already pointed out imposes certain restrictions upon the alienation of lands by the Indians. Section 6 after authorizing the Secretary of the Interior or his representatives to take special interest in behalf of minors under guardianship enacts that:

"Said representatives of the Secretary of the Interior are further authorized, and it is made their duty, to counsel and advise all allottees, adult or minor, having restricted lands of all of their legal rights with reference to their restricted lands, without charge, and to advise them in the preparation of all leases authorized by law to be made, and at the request of any allottee having restricted land he shall, without charge, except the necessary court and recording fees and expenses, if any, in the name of the allottee, take such steps as may be necessary, including the bringing of any suit or suits and the prosecution and appeal thereof, to cancel and annul any deed, conveyance, mortgage, lease, contract to sell, power of attorney, or any other incumbrance of any kind or character, made or attempted to be made or executed in violation of this act or any other act of Congress, and to take all steps necessary to assist said allottees in acquiring and retaining possession of their restricted lands."

Notwithstanding other provisions of the act, referred to in the opinion of the majority, I think the part just quoted manifests a clear legislative intent and purpose that the United States by and through the Secretary of the Interior should act with respect to the violation of restrictions primarily in an advisory way and instead of ever bringing suits in its own name at pleasure, should bring them only when requested by allottees, and then only in their names. If these suits can be maintained, it is not apparent where the government can stop in its litigation in behalf of private persons in the enforcement of national policies. There are certainly many recognized policies besides the Indian policy which might be materially subserved by the practice of governmental intervention as in this case. Where would it end?

In my opinion the judgment below should be affirmed.