UNITED STATES v. BOARD OF COM'RS OF OSAGE COUNTY, OKL., et al.

(Circuit Court, W. D. Oklahoma. December 26, 1911.)

No. 867.

1. TAXATION (§ 181*)—OSAGE INDIAN LANDS—POWER TO TAX.

Under the Osage allotment act (Act Cong. June 28, 1906, c. 3572, 34 Stat. 541, § 2, subd. 4), which makes allotted homesteads "nontaxable until otherwise provided by act of Congress," and under subdivision 7, which authorizes issuance of certificates of competency on which an allottee may alienate his lands, except his homestead, which shall remain nontaxable for 25 years or during his life, the homesteads of deceased allottees remain exempt until removal of the exemption by Congress.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. § 45; Dec. Dig. § 181;* Indians, Cent. Dig. § 54.]

2. TAXATION (§ 181*)—OSAGE INDIAN LANDS—POWER TO TAX.

Under the Osage allotment act (Act Cong. June 28, 1906, c. 3572, 34 Stat. 541, § 2, subd. 4), making homesteads "inalienable and nontaxable" until otherwise provided by Congress, and making surplus lands "inalienable" for 25 years, and under subdivision 7, providing for issuance of certificates of competency on which an allottee may alienate his surplus lands, except as to minerals, but making surplus lands nontaxable for three years from approval of the act except on death of the allottee or issuance of such certificates, the surplus lands, exclusive of minerals thereunder, are taxable after expiration of the three-year period, or on issuance of a certificate.

[Ed. Note.—For other cases, see Taxation, Cent. Dig, § 45; Dec. Dig. § 181;* Indians, Cent. Dig. § 54.]

3. STATUTES (§ 205*)—CONSTRUCTION.

The meaning of an enactment should be deduced from all of its provisions.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 282; Dec. Dig. § 205.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

**4. STATUTES (§ 194*)—CONSTRUCTION.**
The different provisions of an act should be harmonized and general language restricted by particular expressions, if such, upon careful examination of the subject, appears to have been the intent.
[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 272; Dec. Dig. § 194.*]

**5. TAXATION (§ 181*)—INDIAN LANDS—POWER OF CONGRESS.**
Congress can provide when and on what terms lands allotted to Indians shall be taxable or alienable.
[Ed. Note.—For other cases. see Taxation, Cent. Dig. § 45; Dec. Dig. § 181;* Indians, Cent. Dig. § 54.]

**6. STATUTES (§ 215*)—CONSTRUCTION.**
If the language of an act is doubtful, the circumstances attending its adoption are proper aids to construction.
[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 291; Dec. Dig. § 215.*]

**7. TAXATION (§ 500*)—POWER OF UNITED STATES.**
The United States can maintain a bill to cancel taxes unlawfully assessed under state government on lands of Indian allottees.
[Ed. Note.—For other cases, see Taxation, Dec. Dig. 500.*]

In Equity. Bill by the United States against the Board of County Commissioners of Osage County, Okl., and others. On demurrer to the bill. Demurrer partly overruled, and partly sustained.

John Embry, U. S. Atty.

Kappler & Merillat and Preston A. Shinn, for Osage Tribe.

Charles West, Atty. Gen., Charles L. Moore, Asst. Atty. Gen., and C. K. Templeton, for defendants.

COTTERAL, District Judge. [1] This suit is brought by the United States to obtain a decree enjoining the enforcement by county officers of taxes levied for the year 1910 upon certain lands allotted to Osage Indians, under Act June 28, 1906, 34 Stat. 539, in Osage county, in this state, on the ground that such lands were not subject to taxation for that year. This act provides for the distribution of the lands which formerly constituted the reservation of the Osage Tribe, now organized as Osage county, by way of three selections of 160 acres each to the several members of the tribe and an equal division of the remainder, one of the selections to be designated as a homestead and the others and the remaining shares as surplus lands. Taxes are involved upon both homestead and surplus lands, the former where the allottees are deceased and no certificates of competency were issued either to them or their heirs, and the latter (1) where the allottees are living and received certificates, and (2) where they are deceased and did not receive certificates and their heirs or only a part of them received certificates, and in one case one heir received a certificate and the other heir is not a member of tribe. The bill describes only specific tracts presenting these conditions, but a comprehensive decree is sought adjudicating the validity of the taxes upon all similar lands. The defendants have filed a demurrer to the bill, which has been argued, and is now to be ruled upon by the court.

By section 1 of the enabling act for Oklahoma (Act June 16, 1906,

34 Stat. 267), it is provided that the inhabitants of Oklahoma and Indian Territory may adopt a Constitution and become a state, but that nothing contained in the Constitution "shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights, by treaties, agreement, law, or otherwise, which it would have been competent to make if the act had not been passed." The act also required that the constitutional convention, by ordinance irrevocable, accept its terms and conditions (section 22); and they were duly accepted. Snyder's Const. p. 394. The state Constitution declares not taxable property which is exempt "by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws, during the force and effect of such treaties or federal laws." Article 10, § 6. It is not questioned that the liability of the lands involved to taxation is dependent on the legislation of Congress on the subject.

Distinct provisions are found in the allotment act of 1906 relative to taxation of these lands. Subdivision 4 of section 2 provides that the homestead "shall be inalienable and nontaxable until otherwise provided by act of Congress," and that the surplus lands "shall be inalienable for twenty-five years, except as hereinafter provided." Subdivision 7 of the same section is as follows:

"That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, that upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States: Provided, that the surplus lands shall be nontaxable for the period of three years from the approval of this act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress: And provided further, that nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided: And provided further, that the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years unless otherwise provided for by act of Congress."

And section 6 provides:

"That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the Territory of Oklahoma, or of the state in which the reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

With respect to the homesteads, the position taken in behalf of the defendants to sustain the taxes is that the exemption, previously existing, terminates in any event with the death of the allottees. But, in the view of this court, the homesteads are not taxable upon the death of the allottees unless certificates of competency are issued to them. Subdivisions 4 and 7 of section 2 should be construed together, and both harmonized and given effect. A conflict of terms is avoided by taking the former to refer to cases where the certificates are not issued and the latter to those where they have issued, and this is clearly the construction which should be adopted. The result is that the homesteads remain inalienable and nontaxable, in the absence of certificates, without further legislation, but, if the certificates issue to the allottees, then their homesteads are inalienable and nontaxable for 25 years, or during the life of the allottee. It is not specified that the homesteads are, in these contingencies, alienable and taxable, but that they were intended to be so seems plain from the language used, if any definite purpose is to be assigned to the provisions, and if the policy is to obtain, as uniformly pursued, of advancing the Indians to independent citizenship, common incidents of which are the right to dispose of property and the duty to pay taxes for the support of government. This court has held that the restriction against alienation of the homesteads of these allottees to whom certificates were not issued is impersonal to the allottee and applicable to the lands, disabling the heirs also to convey, and that subdivision 7 does not relate to homesteads where the certificates are not issued. U. S. v. Aaron (C. C.) 183 Fed. 347. The exemption should be held, regardless of the death of the allottees, to coexist with the restriction against alienation, and to continue for the same time. They are mentioned in close relation, similar reasons justify their operation for a common term, and they should be held effective therefor, in the absence of any expression to the contrary; the rule being that when Indian lands, held in severalty, are not alienable, they are not subject to taxation. Catholic Missions v. Missoula County, 200 U. S. 118, 26 Sup. Ct. 197, 50 L. Ed. 398; Goudy v. Meath, 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130; 22 Cyc. 138. When no certificates of competency issue, the homesteads, whether held by the allottees or their heirs, remain an instrumentality employed by the national government, pursuant to the constitutional power it possesses to deal with the Indians for their protect n and welfare, and are not subject to taxation. U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848; U. S. v. Thurston County (C. C.) 140 Fed. 456. The question presented for decision in respect of the homesteads is whether they are exempt where the allottees died without receiving certificates of competency. In the opinion of this court they are exempt, and will so remain until Congress shall remove the exemption.

[2] A different controversy is presented as to the taxes laid upon the surplus lands. For the defendants, the contention is that these lands became taxable by the provisions of the act of 1906, after three years from the approval of the act, regardless of the issuance of the

certificates of competency, or the survival of the allottees, and therefore the taxes in question for the year 1910 should be sustained. On the other hand, it is insisted that these lands, as declared by the act of 1906, are held in trust by the United States, and, by its provisions construed in the light of settled policy manifested in this and analogous legislation, they are effectively reserved from taxation.

The conclusion has been reached by this court that, by subdivisions 4 and 7 of section 2 of the act of 1906, the surplus lands are alienable by the allottees thereof at the end of 25 years, or when certificates of competency are issued to them, and that they are taxable at the end of 3 years from the approval of the act, or on the issuance of such certificate, or at the death of the allottees. These lands are not specifically declared to be taxable after three years, but such is the obvious purpose of defining the period of exemption. It is expressly provided that they shall be taxable when the certificates issue. And they are taxable "in case of the death of the allottee," because this exemption clause is so connected with the preceding one that it is clear both are contingencies when taxation is permitted. These provisions, considered alone, must be construed as plainly rendering taxable for the year 1910 all of these surplus lands, because the three-year period of exemption had expired prior to that year, a part of the lands because certificates of competency have issued to the allottees thereof, and another part of the lands because the allottees thereof were deceased.

[3] But it is an established rule that the meaning of an enactment should be deduced from all of its provisions. Kohlsaat v. Murphy, 96 U. S. 153, 24 L. Ed. 844. And the inquiry must be made whether the foregoing construction should prevail upon consideration of other provisions of the act along with those above quoted. The provisions of section 9, respecting the election and tenure of tribal officers, cannot be deemed influential upon the question of taxation as no reference is made to the subject, and it was well known that ample interests would in the future continue to command the attention of the tribal organization, notwithstanding the taxation or even the sale of a portion of the allotted lands. The reservations of lands for schools and other purposes are separately provided for, and the provisions concerning them do not relate to taxation of the allotments, and are altogether consistent with it. The various provisions as to the tribal funds and moneys are likewise independently dealt with, and do not appear to have any material bearing on the matter of taxes, except in so far as they pertain to the royalties for minerals, but the mineral interest in these lands does not appear to be affected by the taxation complained of in this case. Section 5 contains provisions of most weight against the validity of the taxes. It provides:

"That at the expiration of the period of twenty-five years from and after the first day of January, nineteen hundred and seven, the lands, mineral interests, and moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage Tribe, according to the roll herein provided for, or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their

heirs, as herein provided, and said members shall have full control of said lands, moneys, and mineral interests, except as hereinbefore provided."

This section does not purport to define the trust or specify its obligations, and they are only ascertainable, whatever they may be, from other portions of the act. The trust could not be absolute as to the surplus lands of the Indians entitled to certificates of competency, without being in direct conflict with the authority of subdivision 7 of section 2 to issue them and confer the right upon the members "to manage, control, and dispose of his or her land, the same as any citizen of the United States."

[4] The different provisions of an act should be harmonized and general language restricted by particular expressions, if such, upon careful examination of the subject, appears to have been the intent. Atkins v. Fiber Disintegrating Co., 18 Wall. 272, 21 L. Ed. 841. And, as the general reference to the trust in section 5 appears to be qualified by the words "as herein provided," its scope may be consistently construed as confined to the reservations and to the lands not subject to alienation, and likewise to such lands subject to taxation so far as the ends of taxation would permit. The duty of the government as to all such lands would be, for example, to protect the title from conveyances and incumbrances and prevent unlawful interference with the use of the lands. U. S. v. Allen, 179 Fed. 13, 103 C. C. A. 1. Section 7, relating to the uses and leasing of the lands, subject to the approval of the Secretary of the Interior, should be held applicable to the same class of lands.

[5] A question arises as to the soundness of a construction by which the surplus lands, although inalienable, may be subject to taxation. As already noticed, the powers of alienation and taxation generally are forbidden or authorized concurrently. But the subject is purely legislative, and no question can be raised as to the power of Congress to prescribe absolutely the time and terms for the exercise of both. Rainbow v. Young, 161 Fed. 835, 88 C. C. A. 653. This being so, it may forbid one and authorize the other. It will be noted that subdivision 4 of section 2 declares the homesteads inalienable and nontaxable, but declares the surplus lands inalienable only, forcibly manifesting a purpose to permit the taxation of the latter in advance of alienation.

[6] If the language of an act is doubtful, the circumstances attending its adoption are proper aids to construction. Platt v. Union Pacific R. Co., 99 U. S. 48, 25 L. Ed. 424. The constitutional convention was required by section 21 of the enabling act, then but recently passed, to constitute the Osage reservation a single county, pending allotment, and, until legislative change, designate the county seat and regulate the first election of county officers. These Indians were to obtain the advantages of state and local government which would redound to their welfare and advancement. It was well known that their lands were valuable and their funds large, so that ordinary taxation of these surplus lands would not be burdensome when compared with the benefits to accrue to the Indians; and it was a matter of first importance that these lands yield their portion of the public

revenues, as they embraced the greater part of the reservation and the county into which it was to be merged. Divestments of title through taxation, unlike conveyances, are readily avoided by payment of the taxes. And it is only reasonable to say that it was contemplated the means would be found or supplied by future enactment to pay the taxes the Indians might upon experiment fail to pay, and that it was deemed just and prudent under the circumstances to permit the taxation of this portion of the allotted lands while denying the Indians the right to voluntarily alienate them. Legislative sanction to an extent for this view is found in the act of March 1, 1907 (34 Stat. 1016), which authorizes the Commissioner of Indian Affairs to pay from the funds of Indians taxes upon lands subject to alienation.

The provisions adopted as to the reservation of the minerals, which have been adverted to, should be duly considered in ascertaining the intent with respect to taxation. Subdivision 7 of section 2 of the act of 1906 distinctly provides that the sale of the minerals is not authorized; that they are reserved for 25 years to the tribe; that the tribe shall receive the royalties; and that, at the expiration of that period, the minerals shall be the individual property of the owners of the lands. When that act was passed, some of the lands in the reservation had been found to contain oil and gas, a lease had been made of the entire reservation for their development as early as March 16, 1896, and was renewed by act of Congress in 1905 upon about 600,000 acres thereof in favor of an oil company then owning the original lease for 10 years from March 16, 1906, the royalty for gas being specified and for oil being left to the President. Act March 3, 1905, 33 Stat. 1061. It was declared in this act that the allotments of the reservation should be subject to that lease, which was later confirmed by section 2 of the act of 1906. By section 3 of the latter act, these products are reserved to the tribe for 25 years from April 8, 1906, and leases thereof by the tribe are authorized with the Secretary's approval, the royalties are to be fixed by the President, the consent of the Secretary is made requisite to prospecting or mining on homestead selections, and any valid existing lease is not to be affected.

But these various provisions do not, any or all of them, afford ground for holding that the surplus lands of the allottees and their successors—that is, their interest apart from the mineral interest—were intended to be exempted. On the contrary, the special protection of the mineral interest from sale, if persuasive of intent, adds weight to the view that the lands, aside from that interest, were to be subject to taxation upon the conditions stated. Subdivision 7 of section 2 of the act of 1906, so far as it pertains to taxation, is consistent with the provisions which have been noticed and the others contained in the act, and its force and meaning, as first above indicated, are not affected by a consideration of the act in its entirety.

The policies manifested in enactments pertaining to different tribes and the decisions judicially construing them should be taken into account, and undeniably they lend support to the ground taken in opposition to the taxes in question. But these and the other considerations urged are believed to be insufficient to warrant any other con-

clusion than that it was the intent of Congress by the act of 1906 to remove the exemption of the surplus lands and authorize the taxation of all of them for the year 1910. By this holding, however, is not meant that the interest in the minerals reserved to the tribe is subject to taxation. Every sale of this interest is declared unauthorized, and it must be immaterial whether accomplished by the voluntary act of the allottee or by the involuntary process of taxation. The reservation of this interest for the use of the tribe is an instrumentality, not only employed by the United States in carrying out a governmental policy, but expressly reserved from sale for the period of 25 years. And this title and right of the tribe is not the subject of assessment, tax levy, or sale, and will not pass or be vested in any grantee by an attempted sale or transfer. Articles 2 and 3, c. 98, Compiled Laws of Oklahoma for 1909, provide that all property shall be listed and assessed at fair cash value, in the name of the owner, on March 1st of each year. It is not alleged nor contended that the reserved interest of the tribe in the minerals has been included in the assessment as a basis for the taxes upon any of these lands, or that the assessments in the names of the allottees were made in a manner contrary to the laws of the state. The taxes must, therefore, be considered as lawfully imposed upon the interest of the allottees in these surplus lands.

[7] The duty of the government in the execution of its policy entitles it to maintain the bill and obtain relief in equity, canceling the taxes against the homestead, and enjoining their enforcement. U. S. v. Allen, 179 Fed. 13, 103 C. C. A. 1. In this respect, the demurrer must fail and will be overruled.

In the case of the surplus lands, the demurrer is well taken and will be sustained.