## UNITED STATES *v.* RICKERT.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

No. 216.    Argued January 28, 29, 1903.—Decided February 23, 1903.

By the act of Congress of February 8, 1887, c. 119, known as the Indian
General Allotment Act it was provided: " That upon the approval of the
allotments provided for in this act by the Secretary of the Interior, he
shall cause patents to issue therefor in the name of the allottees, which
patents shall be of the legal effect, and declare, that the United States
does and will hold the land thus allotted, for the period of twenty-five
years, in trust for the sole use and benefit of the Indian to whom such
allotment shall have been made, or, in case of his decease, of his heirs
according to the laws of the State or Territory where such land is located,
and that at the expiration of said period the United States will convey the
same by patent to said Indian, or his heirs as aforesaid, in fee, discharged
of said trust and free of all charge or incumbrance whatsoever: *Provided*,
That the President of the United States may in any case in his discretion
extend the period.  And if any conveyance shall be made of the lands set
apart and allotted, as herein provided, or any contract made touching the
same, before the expiration of the time above mentioned, such convey-
ance or contract shall be absolutely null and void."  *Held :*
(1) That neither the lands allotted nor the permanent improvements
        thereon nor the personal property obtained from the United States
        and used by the Indians on the allotted lands, are subject to state
        or local taxation during the period of the trust provided by the
        above act of 1887.
(2) The United States has such an interest in the question as to entitle
        it to maintain a suit to protect the Indians against local or state
        taxation.
(3) This suit was properly brought in equity and not at law, the remedy
        at law not being as adequate and efficacious as was necessary.

THIS suit was instituted under the direction of the Attorney
General of the United States, for the purpose of restraining the
collection of taxes alleged to be due the county of Roberts, South
Dakota, in respect of certain permanent improvements on, and
personal property used in the cultivation of, lands in that county
occupied by members of the Sisseton Band of Sioux Indians in
the State of South Dakota.

The case is here upon questions certified by the judges of the United States Circuit Court of Appeals for the Eighth Circuit.

According to the certificate the bill alleged that Charles R. Crawford, Adam Little Thunder, Solomon Two Stars and Victor Renville are Indians and members of the Sisseton Band of Sioux Indians in the State of South Dakota, wards of the United States and under its guardianship and supervision, and residents of that portion of the Sisseton Agency, situated in the county of Roberts; that the said Indians are holding, and for several years last past have held, allotted lands in that county, and within the former Sisseton Indian Reservation, which lands were allotted to those Indians under the provisions of the agreement of December the 12th, 1889, as ratified by the act of March 3, 1891, 26 Stat. 1035, 1036, and more particularly under section 5 of the General Allotment Act of Congress approved February the 8th, 1887, 24 Stat. 389; and that the lands so allotted by the United States are held in trust by the United States under the provisions of the last named act.

The bill then alleged that during the year 1900 the duly authorized officers of Roberts County listed certain improvements on the allotted lands of Crawford and returned the assessment thereon at the sum of $630, such improvements consisting of a large frame house and barn attached thereto (a fixture and permanent improvement upon the allotted lands), and other improvements of a permanent character attached to these lands; that the amount of taxes extended on the tax roll of such improvements for state and county taxes for the year 1900 was the sum of $21.42; that for that year the officers of Roberts County listed, assessed and returned upon the tax rolls of the county certain personal property against Crawford, consisting of horses, one cow and two wagons, at the aggregate valuation of $129, upon which was assessed and levied a tax of $4.90; and that said personal property was issued to the allottee by the United States pursuant to the acts of Congress and the treaties between the United States and the band of Indians to which Crawford belongs, was branded " I. D.," and was then and there in the possession of the allottee, being kept and used by him upon his allotment.

Similar allegations were made in reference to the other Indians named in the bill, covering the years 1899 and 1900.

It was also alleged that the defendant was County Treasurer and collector of taxes for the county, and threatened to sell and was about to sell the property just described as that of the Indians named in the bill and assessed for the years above stated and would sell the same unless restrained, whereby the United States would be subjected to and compelled to defend a multitude of actions, suits and proceedings which would greatly embarrass it; that the assessments of said property and the amount of taxes so assessed and returned upon the tax roll of the county are upon the books of the county and of record in the office of the County Auditor and Treasurer, and constitute a cloud upon the title of the lands of the United States above referred to.

It was further alleged that the United States was without any plain, adequate and speedy remedy at law, and could only have relief in a court of equity, and that irreparable injury would be inflicted upon it in case the enforcement, assessment and collection of such taxes were not enjoined.

The defendant demurred to the bill upon the following grounds: That it did not disclose any equity nor entitle the United States to the relief prayed; that the United States had no interest in the subject-matter of the suit; that the property assessed by Roberts County was personal property and the injunction would not lie to restrain the collection of the tax, and that the United States had an adequate remedy at law.

The demurrer to the bill was sustained, and the Government, failing to amend, the bill was dismissed upon the merits. 106 Fed. Rep. 1. Subsequently the case was carried to the Circuit Court of Appeals.

Thereupon that court made a certificate of certain questions in respect to which it desired the instructions of this court. These questions will be referred to in the course of this opinion.

*Mr. Assistant Attorney General Van Devanter* for appellant.
*Mr. Assistant Attorney Webster* was with him on the brief.

*Mr. A. B. Kittredge* and *Mr. W. D. Lane* for appellee.

Mr. Justice Harlan, after making the foregoing statement, delivered the opinion of the court.

I. *Were the lands held by the allottees, Charles B. Crawford and the other Indians named in the bill, subject to assessment and taxation by the taxing authorities of Roberts County, South Dakota?*

This is the first of the questions certified by the judges of the Circuit Court of Appeals. It is not, in our opinion, difficult of solution.

By the act of Congress of February 8, 1887, c. 119, referred to in the certificate and known as 'the General Allotment Act, provision was made for the allotment of lands in severalty to Indians on the various reservations, and for extending the protection of the laws of the United States and the Territories over the Indians. To that end the President was authorized, whenever, in his opinion, a reservation or any part thereof was advantageous for agricultural and grazing purposes, to cause it, or any part thereof, to be surveyed or resurveyed if necessary, and to allot the lands in the reservation in severalty to any Indian located thereon in certain quantities specified in the statute—the allotments to be made by special agents appointed for that purpose, and by the agents in charge of the special reservations on which the allotments were made. 24 Stat. 388, 389–90, § 1.

What interest, if any, did the Indian allottee acquire in the land allotted to him? That question is answered by the fifth section of the allotment act, which provides: "That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where

such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: *Provided,* That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: *Provided,* That the law of descent and partition in force in the State or Territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided; . . . ." 24 Stat. 389, § 5.

The word " patents," where it is first used in this section, was not happily chosen to express the thought which, it is clear, all parts of the section being considered, Congress intended to express. The " patents " here referred to (although that word has various meanings) were, as the statute plainly imports, nothing more than instruments or memoranda in writing, designed to show that for a period of twenty-five years the United States would hold the land allotted, in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period—unless the time was extended by the President—convey the fee, discharged of the trust and free of all charge or incumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee. This interpretation of the statute is in harmony with the explicit declaration that any conveyance of the land, or any contract touching the same, while the United States held the title in trust, should be absolutely null and void. So that the United States retained its hold on the land allotted for the period of twenty-five years after the allotment, and as much longer as the President, in his discretion, should determine.

The bill, as appears from the certificate of the judges, shows

that the lands in question were allotted "under provisions of the agreement of December 12, 1889, as ratified by the act of March 3, 1891, and more particularly under section V of the General Allotment Act approved February 8, 1887." Upon inspection of that agreement we find nothing that indicates any different relation of the United States to the allotted lands from that created or recognized by the act of 1887. On the contrary, the agreement contemplates that patents shall issue for the lands allotted under it "upon the same terms and conditions and limitations as is provided in section five of the act of Congress approved February 8, 1887." 26 Stat. 1035, 1036, art. IV.

If, as is undoubtedly the case, these lands are held by the United States in execution of its plans relating to the Indians —without any right in the Indians to make contracts in reference to them or to do more than to occupy and cultivate them —until a regular patent conveying the fee was issued to the several allottees, it would follow that there was no power in the State of South Dakota, for state or municipal purposes, to assess and tax the lands in question until at least the fee was conveyed to the Indians. These Indians are yet wards of the Nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the act of 1887, and the agreement of 1889, ratified by the act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship. To tax these lands is to tax an instrumentality employed by the United States for the benefit and control of this dependent race, and to accomplish beneficent objects with reference to a race of which this court has said that "from their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the

question has arisen." *United States* v. *Kagama,* 118 U. S. 375, 384. So that if they may be taxed, then the obligations which the Government has assumed in reference to these Indians may be entirely defeated; for by the act of 1887 the Government has agreed at a named time to convey the land to the allottee in fee, discharged of the trust, "and free of all charge or incumbrances whatsoever." To say that these lands may be assessed and taxed by the county of Roberts under the authority of the State, is to say they may be sold for the taxes, and thus become so burdened that the United States could not discharge its obligations to the Indians without itself paying the taxes imposed from year to year, and thereby keeping the lands free from incumbrances.

In *Van Brocklin* v. *State of Tennessee,* 117 U. S. 151, 155, the court held that property of the United States was exempt by the Constitution of the United States from taxation under the authority of any State. Giving the outlines of the grounds of the judgment delivered by Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, the court said: "That Constitution and the laws made in pursuance thereof are supreme; they control the constitutions and laws of the respective States, and cannot be controlled by them. The people of a State give to their government a right of taxing themselves and their property at its discretion. But the means employed by the Government of the Union are not given by the people of a particular State, but by the people of all the States; and being given by all, for the benefit of all, should be subjected to that Government only which belongs to all. All subjects over which the sovereign power of a State extends are objects of taxation; but those over which it does not extend are, upon the soundest principles, exempt from taxation. The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission; but does not extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States. The attempt to use the taxing power of a State on the means employed by the Government of the Union, in pursuance of the Constitution, is itself an abuse, because it is

the usurpation of a power which the people of a single State cannot give. The power to tax involves the power to destroy; the power to destroy may defeat and render useless the power to create; and there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control. The States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the General Government."

These principles were recognized and applied in *Wisconsin Railroad Co.* v. *Price County*, 133 U. S. 496, 504, in which the court said: "The Constitution vests in Congress the power to ' dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise."

It was therefore well said by the Attorney General of the United States, in an opinion delivered in 1888, " that the allotment lands provided for in the act of 1887 are exempt from state or territorial taxation upon the ground above stated, . · . . namely, that the lands covered by the act are held by the United States for the period of twenty-five years in trust for the Indians, such trust being an agency for the exercise of a Federal power, and therefore outside the province of state or territorial authority." 19 Op. Atty. Gen. 161, 169.

In support of these general views reference may be made to the following cases : *Weston* v. *City of Charleston*, 2 Pet. 467; *McCulloch* v. *Maryland*, 4 Wheat. 316 ; *Osborn* v. *Bank of the United States*, 9 Wheat. 738 ; *United States* v. *Rogers*, 4 How. 567; *New York Indians*, 5 Wall. 761; *Choctaw Nation* v. *United States*, 119 U. S. 1, 27; *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 483 ; *Cherokee Nation* v. *Southern Kansas Railway Co.*, 135 U. S. 641, 653 ; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *Lone Wolf* v. *Hitchcock*, 187 U. S. 553.

Another suggestion by the defendant deserves to be noticed.

It is that there is a " compact" between the United States and the State of South Dakota which, if regarded, determines this case for the State. Let us see what there is of substance in this view.

By the act of February 22, 1889, c. 180, providing among other things for the division of the Territory of Dakota into two States, it was declared that the conventions called to frame constitutions for them should provide, " by ordinances irrevocable without the consent of the United States and the people of said States," as follows:

" Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; . . . that no taxes shall be imposed by the States on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved for its use. But nothing herein, or in the ordinances herein provided for, shall preclude the said States from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of Congress containing a provision exempting the lands thus granted from taxation; but said ordinances shall provide that all such lands shall be exempt from taxation by said States so long and to such extent as such act of Congress may prescribe." 25 Stat. 677.

That provision was embodied in the constitution of South Dakota—for the purpose no doubt of meeting the views of Congress expressed in the Enabling Act of 1889—and was declared by that instrument to be irrevocable without the consent of the United States and the people of the State expressed by

their legislative assembly; and this action of the United States and of the State constitutes the "compact" referred to, and upon which the appellee relies in support of the taxation in question.

We pass by, as unnecessary to be considered, whether the above provision in the act of Congress of 1889 had any legal efficacy in itself, after the admission of South Dakota into the Union upon an equal footing with the other States; for the same provision, in the state constitution, deliberately adopted by the State, is, without reference to the act of Congress, the law for its legislature and people, until abrogated by the State. Looking at that provision, we find nothing in it sustaining the contention that the county of Roberts has any authority to tax these lands. On the contrary, it is declared in the state constitution that lands within the limits of the State, owned or held by any Indian or Indian tribe, shall, until the title has been extinguished by the United States, remain under the absolute jurisdiction and control of the Congress of the United States. And when the State comes to declare, in its constitution, what taxes it shall not be precluded from imposing, the provision is that it shall not be precluded from taxing, as other lands, "any lands owned or held by any Indian who has severed his tribal relation, *and* has obtained from the United States, or from any person, a title thereto *by patent or other grant.*" Art. XXII. The patent or grant here referred to is the final patent or grant which invests the patentee or grantee with the title in fee, that is, with absolute ownership. No such patent or grant has been issued to these Indians. So that the appellee cannot sustain the taxation in question under the clause of the state constitution to which he refers, and the right to tax these lands must rest upon the general authority of the legislature to impose taxes. But, as already said, no authority exists for the State to tax lands which are held in trust by the United States for the purpose of carrying out its policy in reference to these Indians.

II. *Were the permanent improvements, such as houses and other structures upon the lands held by allotment by Charles R. Crawford and the other Indians named in the bill, subject to*

*assessment and taxation by the taxing officers of Roberts County as personal property in 1899 and 1900?* This is the second of the questions certified by the Judges of the Circuit Court of Appeals..

Looking at the object to be accomplished by allotting Indian lands in severalty, it is evident that Congress expected that the lands so allotted would be improved and cultivated by the allottee. But that object would be defeated if the improvements could be assessed and sold for taxes. The improvements to which the question refers were of a permanent kind. While the title to the land remained in the United States, the permanent improvements could no more be sold for local taxes than could the land to which they belonged. Every reason that can be urged to show that the land was not subject to local taxation applies to the assessment and taxation of the permanent improvements.

It is true that the statutes of South Dakota, for the purposes of taxation, classify "all improvements made by persons upon lands held by them under the laws of the United States" as personal property. But that classification cannot apply to permanent improvements upon lands allotted to and occupied by Indians, the title to which remains with the United States, the occupants still being wards of the Nation, and as such under its complete authority and protection. The fact remains that the improvements here in question are essentially a part of the lands, and their use by the Indians is necessary to effectuate the policy of the United States.

Counsel for the appellee suggests that the only interest of the United States is to be able at the end of twenty-five years from the date of allotment to convey the *land* free from any charge or encumbrance; that if a house upon Indian land were seized and sold for taxes, that would not prevent the United States from conveying the *land* free from any charge or incumbrance; and that, in such case, the Indians could not claim any breach of contract on the part of the United States. These suggestions entirely ignore the relation existing between the United States and the Indians. It is not a relation simply of contract, each party to which is capable of guarding his own interests, but the

Indians are in a state of dependency and pupilage, entitled to the care and protection of the Government. When they shall be let out of that state is for the United States to determine without interference by the courts or by any State. The Government would not adequately discharge its duty to these people if it placed its engagements with them upon the basis merely of contract and failed to exercise any power it possessed to protect them in the possession of such improvements and personal property as were necessary to the enjoyment of the land held in trust for them. In *Choctaw Nation* v. *United States,* 119 U. S. 1, 28, this court said: "The recognized relation between the parties to this controversy, therefore, is that between a superior and an inferior, whereby the latter is placed under the care and control of the former, and which, while it authorizes the adoption on the part of the United States of such policy as their own public interests may dictate, recognizes, on the other hand, such an interpretation of their acts and promises as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection. The parties are not on an equal footing, and that inequality is to be made good by the superior justice which looks only to the substance of the right, without regard to technical rules framed under a system of municipal jurisprudence, formulating the rights and obligations of private persons, equally subject to the same laws." See also *Minnesota* v. *Hitchcock,* 185 U. S. 373, 396.

III. *Was the personal property, consisting of cattle, horses and other property of like character, which had been issued to these Indians by the United States, and which they were using upon their allotments, liable to assessments and taxation by the officers of Roberts County in 1899 and 1900?* This is the third one of the certified questions.

The answer to this question is indicated by what has been said in reference to the assessment and taxation of the land and the permanent improvements thereon. The personal property in question was purchased with the money of the Government and was furnished to the Indians in order to maintain them on the land allotted during the period of the trust estate, and to

induce them to adopt the habits of civilized life. It was, in fact, the property of the United States, and was put into the hands of the Indians to be used in execution of the purpose of the Government in reference to them. The assessment and taxation of the personal property would necessarily have the effect to defeat that purpose.

IV. *Has the United States such an interest in this controversy or in its subjects as entitles it to maintain this suit?* This is the fourth one of the certified questions.

In view of the relation of the United States to the real and personal property in question, as well as to these dependent Indians still under national control, and in view of the injurious effect of the assessment and taxation complained of upon the plans of the Government with reference to the Indians, it is clear that the United States is entitled to maintain this suit. No argument to establish that proposition is necessary.

V. *Has the United States a remedy at law so prompt and effi- cacious that it is deprived of all relief in equity?* This is the last of the certified questions.

We do not perceive that the Government has any remedy at law that could be at all efficacious for the protection of its rights in the property in question and for the attainment of its purposes in reference to these Indians. If the personal property and the structures on the land were sold for taxes and possession taken by the purchaser, then the Indians could not be main- tained on the allotted lands and the Government, unless it aban- doned its policy to maintain these Indians on the allotted lands, would be compelled to appropriate more money and apply it in the erection of other necessary structures on the land and in the purchase of other stock required for purposes of cultivation. And so on, every year. It is manifest that no proceedings at law can be prompt and efficacious for the protection of the rights of the Government, and that adequate relief can only be had in a court of equity, which, by a comprehensive decree, can finally determine once for all the question of the validity of the assessment and taxation in question, and thus give security against any action upon the part of the local authorities tending to interfere with the complete control, not only of the Indians

by the Government, but of the property supplied to them by the Government and in use on the allotted lands. *Railway Co.* v. *McShane,* 22 Wall. 444; *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 550, 564–66.

Some observations may be made that are applicable to the whole case. It is said that the State has conferred upon these Indians the right of suffrage and other rights that ordinarily belong only to citizens, and that they ought, therefore, to share the burdens of government like other people who enjoy such rights. These are considerations to be addressed to Congress. It is for the legislative branch of the Government to say when these Indians shall cease to be dependent and assume the responsibilities attaching to citizenship. That is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress.

We answer the fourth question in the affirmative, and the first, second, third and fifth questions in the negative. It will be so certified to the Circuit Court of Appeals.

*Answers certified.*

Mr. Justice Brewer took no part in the decision of this case.