# HUDSON OIL COMPANY v. THE BOARD OF COUNTY COMMISSIONERS OF FREMONT COUNTY, WYOMING

(No. 1916; December 10, 1935; 52 Pac. (2d) 683)

For the plaintiff in error, there was a brief by *Hagens & Wehrli* and oral argument by *G. R. Hagens.*

4

For the defendant in error, there was a brief and oral argument by *H. S. Harnsberger,* of Lander.

*Hagens & Wehrli* in reply.

6

RINER, Justice.

These proceedings in error were brought by the Hudson Oil Company, hereinafter usually referred to as the "Oil Company" or the "plaintiff," as plaintiff in error, against The Board of County Commissioners of the County of Fremont, Wyoming, for convenience designated subsequently herein "the County Board," as defendant in error, to review a judgment of the district court of Fremont County, which declined to allow the plaintiff any recovery for certain taxes alleged to be illegal and wrongfully collected by and paid by it under protest to the County Treasurer of said County.

The record before us discloses that the case was allowed in the district court to pursue a course which we can hardly approve and which has made more difficult our task of ascertaining and disposing of the several contentions made by the parties.

After an amended petition had been filed by the plaintiff the County Board interposed a general demurrer thereto. The questions thus raised appear to have been fully argued and taken under advisement by the court. Thereafter, without obtaining a ruling upon the demurrer and without any further pleadings filed in the case, there was filed, and also presented to the court, an "Agreed Statement of Facts," which was

stipulated by the parties to be "all the evidence in the case" and upon which the case was immediately "submitted to the court for final decision * * * * without further argument." The judgment in question expressly recited that no ruling was made on the demurrer aforesaid and that the decision was predicated upon a consideration of the "Agreed Statement of Facts" referred to above. After the rendition of the judgment a motion for new trial was made and overruled and the review proceedings thereafter instituted.

It is evident that the case cannot be regarded as coming within the purview of Sections 89-1323 to 89-1325, inclusive, W. R. S. 1931, relating to the submission of a controversy on an agreed statement. The statutory procedure there outlined was not followed; and it has been held in a number of states, possessing laws of the character embodied in the sections just cited, that an affidavit to the effect that "the controversy is real, and the proceedings in good faith, to determine the rights of the parties" must be filed in the matter as a prerequisite to jurisdiction on the part of the court to consider it. Arnold v. Porter, 119 N. Car. 123, 25 S. E. 785; Jones v. Commissioners, 88 N. Car. 56; Jones v. Hoffman, 18 B. Mon. (Ky.) 656; Keeline v. City of Council Bluffs, 62 Iowa 450, 17 N. W. 668; Town of Plainfield v. Village of Plainfield, 67 Wis. 525, 30 N. W. 673; Sharpe v. Sharpe, Adm'r., 27 Ind. 507; Manchester v. Dodge, 57 Ind. 584.

In order to determine the issues to be considered in this state of the record, as well as the permissible claims of the litigants thereon, we are not aided by the ordinary rules of procedure. It is true that in the stipulated statement of facts the contentions of the parties are set forth, but they cannot be regarded as either facts or evidence. City of Yonkers v. Yonkers Electric Light & Power Co., 173 App. Div. 477, 159 N. Y. Supp. 439; Kelly v. Kelly, 72 App. Div. 487, 76 N. Y. Supp.

558. It seems, however, that cases somewhat akin to that at bar, as respects submission upon agreed facts plus absence of all pleadings after the initial one and consequent question as to what should be regarded as the real issues to be determined, have arrived in appellate courts for decision. In Saltonstall v. Russell, 152 U. S. 628, 14 Sup. Ct. Rep. 733, 38 L. Ed. 576, it appeared that no answer was filed and the case was submitted to the court's decision upon a stipulated statement of facts. In the course of the court's disposition of the case, Mr. Justice Gray said:

"The case having been submitted to the circuit court upon a statement of facts agreed by the parties, or case stated, upon which the court was to render such judgment as the law required, all questions of the sufficiency of the pleadings were waived, and the want of an answer was immaterial; and no finding of facts by the court was necessary."

In District of Columbia v. Lee, 35 App. Cas. (D. C.) 341, the court declared that: "It is well settled that the submission of a cause upon an agreed statement constitutes a waiver of all defects of pleading, and authorizes the determination of the case upon the merits." Pertinent and helpful alike is the view announced in Sawyer v. Corse, 17 Grat. (Va.) 230, 94 Am. Dec. 445, to the following effect:

"The judgment in this case was rendered against Sawyer, who was defendant in the court below, upon a case agreed by the parties. He now contends that the judgment must be reversed, because it does not appear from the record that he had filed any plea. But this objection cannot be sustained. A case may be submitted to the court on a case agreed without a plea as well as with one, and it is sometimes done without either declaration or plea. The defect of pleadings is cured by the agreement. When there is a declaration and no plea, as in the present case, the plaintiff's cause of action, as set forth in the declaration, is submitted to the court without reference to any particular

form of defense; and the defendant is entitled to judgment, if the facts stated afford him a defense of which he might have availed himself under any form of pleading. When the case is submitted after an issue is made up, the decision of the court is restricted to that issue."

In 60 C. J. 83, 84, § 78, additional rules are indicated as applicable to stipulated statements of facts in this wise:

"In the absence of grounds sufficient to authorize a party to withdraw from, or rescind, the stipulation, or the court to set it aside, an agreed statement of facts on which the parties submit the case for trial is binding and conclusive on them; and they will not be permitted to deny the truth of the facts stated, nor be heard to claim that there are other facts that the court may presume to exist, and the burden is on the party seeking to recover to show his right from such facts. So, also, the court is conclusively bound by the facts stated and must render judgment according as the facts agreed upon require."

In substance the material facts for our consideration, to be gleaned from the stipulated statement thereof contained in the record, as these: The Oil Company is the owner of two oil and gas leases on allotted Indian lands in the Shoshone Indian Reservation, situated in Fremont County, Wyoming. These leases were duly made pursuant to Act of Congress approved March 3, 1909, 35 Statutes at Large 781-783, 25 U. S. C. A., § 396. One of these leases bears date June 10, 1913, and the other was made July 13, 1923. The lessors in each instrument are the heirs of the Indian Allottees. A fee simple title to the leased lands has never been passed to them from the United States of America, but trust patents, dated respectively October 19, 1907, and May 11, 1916, have been issued either to the allottee or to his heirs under certain provisions of federal law enacted prior to the year 1909 and declaring that:

"The United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State or Territory where such land is located, and that at the expiration of such period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, That the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void."

24 Statutes at Large 389; 31 Statutes at Large 1085; 25 U. S. C. A. § 348. By executive order issued December 30, 1931, under authority granted the President of the United States by Congressional act of June 21, 1906, 34 Statutes at Large 325, 326; 25 U. S. C. A. § 391, the trust periods specified in said patents were extended ten years "from the respective dates of expiration thereof."

During the years 1930 and 1931 the Oil Company produced certain mineral oil from these leases, which was not returned to any officer of the State for taxation in the year the same was produced and was not placed on the assessment roll or tax list of Fremont County in such year. However, in the year following the year when said oil was produced, as stated in the stipulated facts,

"The State Board of Equalization of the State of Wyoming undertook to classify and prescribe and fix a value on the amount of oil aforesaid produced during the previous year and fixed the value thereof above stated, and that thereupon having made and determined the value of said oil, certified the valuation and assessment determined by them to the County Assessor

of Fremont County, Wyoming, and thereupon during the year or years following the years in which such oil was produced, the County Assessor of Fremont County, Wyoming, entered the valuation and assessment so fixed by the State Board of Equalization upon said property upon the lists of taxable property and the assessment rolls of Fremont County, Wyoming, and did thereupon make up his combined assessment roll and tax list, together with his warrant, under his hand, in general terms requiring the Collector and County Treasurer of Fremont County, Wyoming, to collect the taxes therein levied and deliver the same to the Collector of said County, before the third Monday of September of the year following the year in which such oil was produced, and that thereupon the Collector of Taxes of Fremont County, Wyoming, entered upon his records the amount of tax claimed to be due on the oil produced as aforesaid, at the time and in the amounts following:

"In the year 1931, for oil produced from said Lease No. 2123 (2460-M) in the year 1930    $107.18

"In the year 1931, for oil produced from said Lease No. 348-M in the year 1930    458.08

"In the year 1932, for oil produced from said Lease No. 2123 (2460-M) in the year 1931    268.40

"In the year 1932, for oil produced from said Lease No. 348-M in the year 1931    871.22

a total amount of $1,704.88."

It was agreed that the oil thus produced and taxed involved no royalty oil due the lessors. Thereafter the Oil Company protested and objected to paying these taxes, claiming they were illegal and void, but being threatened with the distraint and sale of its property if it failed and refused to pay them, did pay to the County Treasurer of Fremont County the several amounts of the taxes hereinabove specified, said sums being paid to the defendant in error through its said Treasurer, the last payment thereof being made on

May 10, 1933. The plaintiff thereupon brought its action to recover the money thus expended, with the result already stated.

Recalling in this connection the principles announced by the authorities heretofore cited as applicable to the rather anomalous condition of the record and the contentions of the parties, the first question to be considered is whether under the facts presented and the law applicable, the taxes paid as described above, are, as regards the Oil Company, illegal in character.

In United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, the National Supreme Court, discussing the nature of the so-called trust patents which are here involved, has said that they were:

"nothing more than instruments or memoranda in writing, designed to show that for a period of twenty-five years the United States would hold the land allotted, in trust for the sole use and benefit of the allottee, or, in case of his death, of his heirs, and subsequently, at the expiration of that period,—unless the time was extended by the President,—convey the fee, discharged of the trust and free of all charge or encumbrance. In other words, the United States retained the legal title, giving the Indian allottee a paper or writing, improperly called a patent, showing that at a particular time in the future, unless it was extended by the President, he would be entitled to a regular patent conveying the fee. This interpretation of the statute is in harmony with the explicit declaration that any conveyance of the land, or any contract touching the same, while the United States held the title in trust, should be absolutely null and void. So that the United States retained its hold on the land allotted for the period of twenty-five years after the allotment, and as much longer as the President, in his discretion, should determine.

* * * * * * *

"If, as is undoubtedly the case, these lands were held by the United States in execution of its plans relating

to the Indians,—without any right in the Indians to make contracts in reference to them, or to do more than to occupy and cultivate them,—until a regular patent conveying the fee was issued to the several allottees, it would follow that there was no power in the state of South Dakota, for state or municipal purposes, to assess and tax the lands in question until at least the fee was conveyed to the Indians."

See also Childers, State Auditor of Oklahoma v. Beaver, 270 U. S. 555, 46 Sup. Ct. Rep. 387, 70 L. Ed. 462. Accordingly, all the parties to the instant case appear to concede, and properly, that the lands from which the oil was produced as aforesaid could not be subjected to taxation by the State of Wyoming.

The Constitution of this State provides in Section 3 of Article XV thereof:

"All mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, mineral oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof."

The law enacted to carry out the constitutional mandate thus indicated is found in Article 6 of Chapter 115, W. R. S., 1931. The first section thereof, which has since been amended (Laws of Wyoming, Special Session, 1933, Chapter 54), verbatim provides:

"The gross product of all mines and mining claims from which gold, silver and other precious metals, soda, saline, coal, petroleum, or other crude or mineral oil, or natural gas, or other valuable deposit is, or may hereafter be produced, while the same are being worked or operated, but not while the same are simply in the course of development, shall be returned by the owner, owners, lessee, or operator thereof for assess-

ment for taxation, assessed for taxation, and taxed in the manner provided for in this article and such tax shall be in addition to any tax which may be assessed upon the surface improvements of such mines or mining claims, and in lieu of taxes upon the land of such claims while the same are being worked or operated."

The other and following sections provide so far as pertinent here: The second section,—that the lessee or operator of mines or mining claims from which petroleum or other crude or mineral oil was produced, should not later than the second Monday in February in each year, file with the State Board of Equalization a sworn assessment schedule setting forth the gross product, in gallons, of such mine or mineral claim during the calendar year expiring immediately preceding January 1st of the then current year. In case the return is not so made, or the Board believes it to be incomplete or incorrect, it becomes the duty of the Board to obtain the facts "in any manner that may appear most likely to secure the same." Section 3— that the Board, as soon as it possesses these facts, shall fix the valuation, each year, for the assessment of the gross product, in gallons, of all such mines or mining claims. Section 4—verbatim that: "When the state board of equalization shall have made and determined the valuation and assessment of said property, the said board shall certify to the assessor of the county where such property is situated, the valuation and assessment on such property by said board so fixed, and the assessors shall enter such valuation and assessment upon the lists of taxable property in the assessment rolls of the county." The last two sections of the article deal with certain penalties with which we are not now concerned.

The taxes in question here were imposed pursuant to the legal requirements thus stated and not in the usual manner provided by law for taxing either real

property or personal property. (Article 1 of Chapter 115, W. R. S., 1931.) Such taxes were designated by this Court in Miller v. Buck Creek Oil Company, 38 Wyo. 505, 269 Pac. 43, as "evidently a property tax rather than a license privilege or occupational tax." In that case the only question involved was whether the defendant, the lessee of oil placer mining claims, in settling with the lessors for the royalty stipulated by the lease agreement between the parties, had the right to deduct from this royalty the lessors' proportion of the tax levied under the law above mentioned. The district court decided that the deduction was proper and that view was upheld here.

Controlling authority would indicate that as an integral part of the governmental scheme for taking care of its Indian wards, the production of mineral oil involved here may not be subjected to a state tax.

The case of Choctaw, Oklahoma & Gulf Railway Co. v. Harrison, 235 U. S. 292, 35 Sup. Ct. Rep. 27, 59 L. Ed. 234, was one where there was an agreement by the United States that coal lands belonging in common to the members of certain Indian tribes, might be mined, the royalties to be used for the Indians. The State of Oklahoma applied a tax, equal to two percentum, on the gross receipts, from the total production of coal from the mine. Saying that: "Neither state courts nor legislatures, by giving a tax a particular name, or by the use of some form of words, can take away our duty to consider its real nature and effect. Galveston, H. & S. A. R. Co. v. Texas, 210 U. S. 217, 227, 52 L. Ed. 1031, 1037, 28 Sup. Ct. Rep. 638.", in response to the contention that the state statute prescribed only an *ad valorem* imposition on personal property owned by the appellant, i. e., the coal at the mouth of the shaft, the court held that this was an occupation or privilege tax and that the leaseholder

operating in furtherance of a governmental purpose, could not be subjected to such a burden.

In Jaybird Mining Co. v. Weir, County Treasurer, 271 U. S. 609, 46 Sup. Ct. Rep. 592, 70 L. Ed. 1112, Mr. Justice Butler, reviewing the court's previous decisions, said:

"In Howard v. Oil Companies, 247 U. S. 503, 38 S. Ct. 426, 62 L. Ed. 1239, this court affirmed *per curiam*, the judgment of the United States District Court for the Western District of Oklahoma enjoining the enforcement of a tax imposed by the state on the gross value of the production of oil and gas, less the royalty interest, under leases upon Osage lands made for the benefit of the Indians. In Large Oil Co. v. Howard, 248 U. S. 549, 39 S. Ct. 183, 63 L. Ed. 416, this court reversed, *per curiam*, the judgment of the Supreme Court of Oklahoma (63 Okl. 143, 163 P. 537) sustaining a tax on gross value of production of petroleum and gas, less the royalty interest, where the owner of the property sought to be taxed was engaged under the authority of the Secretary of the Interior in the production of oil and gas in what formerly constituted the tribal lands of the Osage Nation. And in Gillespie v. Oklahoma, supra, (257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338) it was held that the net income derived by a lessee from the sale of his share of the oil and gas received under leases of restricted Creek and Osage lands could not be taxed by the state. In each of these cases the tax was condemned as an attempt to tax an instrumentality used by the United States in fulfilling its duties to the Indians."

Reiterating and stating in general terms the doctrine of the foregoing cases in the comparatively recent case of Burnet, Commissioner of Internal Revenue v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 76 L. Ed. 815, the court said:

"The opinion in Gillespie v. Oklahoma, supra, has often been referred to as the expression of an accepted principle. (Citing many prior decisions of the court.)

\* \* \* \* \* \* \* \*

" 'It is an established principle of our constitutional system of dual government that the instrumentalities, means and operations whereby the United States exercises its governmental powers are exempt from taxation by the states, and that the instrumentalities, means and operations whereby the states exert the governmental powers belonging to them are equally exempt from taxation by the United States.' Indian Motorcycle Co. v. United States, supra. (283 U. S. 570, 576, 51 S. Ct. 601, 602, 75 L. Ed. 1277.) Each government is supreme in its sphere; and in order to preserve our dual system this fact must be given recognition."

We do not consider that the case of Indian Territory Illuminating Oil Company v. Board of Equalization of Tulsa County, Oklahoma, 288 U. S. 325, 53 Sup. Ct. Rep. 388, 77 L. Ed. 812, relied upon by the County Board here, is in point. There the oil had been placed in storage, commingled with other oil belonging to the lessee produced from unrestricted lands and assessed under the general laws of the state for annual *ad valorem* taxes, as part of the lessee's personal property in the state.

Guided by the foregoing authorities, we are obliged to conclude that the taxes collected by the County Treasurer of Fremont County from the plaintiff and here involved, were illegal in character.

It is urged for the County Board that it was incumbent upon the plaintiff, in maintaining its burden of proof, to show by some evidence that the lands from which the oil was produced, were lands upon an Indian reservation not created by executive order, and our attention is directed to 44 Statutes at Large 1347, 25 U. S. C. A. 398c, which provides that:

"Taxes may be levied and collected by the State or local authority upon improvements, output of mines or oil and gas wells or other rights, property, or assets of any lessee upon lands within Executive order Indian

reservations in the same manner as such taxes are otherwise levied and collected, and such taxes may be levied against the share obtained for the Indians as bonuses, rentals, and royalties, and the Secretary of the Interior is hereby authorized and directed to cause such taxes to be paid out of the tribal funds in the Treasury: Provided, That such taxes shall not become a lien or charge of any kind against the land or other property of such Indians. (Mar. 3, 1927, c. 299, § 3, 44 Stat. 1347.)"

But all courts of the State and Nation take judicial notice of Acts of Congress and treaties with the Indian tribes (23 C. J. 128, § 1947; 23 C. J. 92, § 1883). The Shoshone Indian Reservation was created by treaty with the Indians, duly ratified by Congress. 15 Statutes at Large 673. Its boundaries were again somewhat changed. 18 Statutes at Large (Part 3) 291. The point suggested, therefore, is, we think, without merit.

Finally, it is insisted in support of the judgment below that there was no presentation of the claim of the Oil Company to the County Board, as required by that part of Section 30-102 W. R. S., 1931, which reads: "All claims and demands held by a person, or persons, company or corporation against a county, shall be presented for audit and allowance to the board of county commissioners of the proper county, as provided by law, before any action, in any court, shall be maintainable thereon." On the argument, we were reminded also of Section 7 of Article XVI of the Wyoming Constitution, which reads in part that, "no bills, claims, accounts or demands against the state, or any county or political sub-division, shall be audited, allowed or paid until a full itemized statement in writing, verified by affidavit, shall be filed with the officer or officers whose duty it may be to audit the same." Whether, while keeping in mind this constitutional provision, under the quoted language of Section 30-102,

supra, presentation of a claim therefor, to the proper officials, should be regarded as a condition precedent to the maintenance of an action for the recovery of illegal taxes, it is not necessary for us to decide.

In Montana National Bank of Billings v. Yellowstone County, Mont., 276 U. S. 499, 48 Sup. Ct. 331, 72 L. Ed. 673, it was held that a national bank before suing to recover taxes on its stock, paid under protest and alleged to be invalid, as being in derogation of federal law, need not apply to the county board of equalization, where that board was unable to take action on the matter because of a binding decision emanating from the court of last resort of the state. Reversing the judgment of the Supreme Court of Montana, the National court of ultimate authority concluded its opinion with the following language:

"Finally, it is urged that plaintiff in error may not maintain this action because of its failure to apply to the county board of equalization for an administrative remedy. We do not stop to inquire whether under any circumstances such remedy was open to the taxpayer, for the short answer is that the decision of the Supreme Court of Montana in the Rogers Case would have rendered any such application utterly futile since the county board of equalization was powerless to grant any appropriate relief in the face of that conclusive decision."

In the case before us the "valuation and assessment" of the property involved were, under the law (Section 115-604 quoted supra) certified by the State Board of Equalization to the proper county officials, and it became their legal duty to enter the same upon the list of taxable property in the assessment rolls of the county. Under such circumstances, we think the County Board would have been without power to act concerning it, if a claim for the refund of these taxes on the ground of their alleged illegality had been pre-

sented to it. That body was bound to carry out the mandate embodied in the certification by the State Board of Equalization dealing with the matter. The consequences of a contrary view would be that the action of the State Board in such matters would be in effect subject to review and possible disregard by every County Board in the State. That cannot be the intent of the law.

Inasmuch as it would have been quite futile to present the claim of the Oil Company to the County Board, we regard that such a procedure,—as intimated in the decision last above cited—was unnecessary before an action to recover the illegal taxes could be instituted. We reach the conclusion, therefore, that the judgment of the district court of Fremont County should be reversed.

*Reversed.*

KIMBALL, Ch. J., and BLUME, J., concur.