### UNITED STATES v. BOARD OF COUNTY COM'RS OF TULSA COUNTY, OKL.

No. 2288.

District Court, N. D. Oklahoma.

June 11, 1937.

C. E. Bailey, U. S. Atty., and Chester A. Brewer, Asst. U. S. Atty., both of Tulsa, Okl., for plaintiff.

John F. Conway, Asst. Co. Atty., of Tulsa, Okl., for defendant.

FRANKLIN E. KENNAMER, District Judge.

The United States of America, in its own right, and on behalf of Pansy B. Hawk, nee Lloyd, a Cherokee Indian allottee of ⅛ Indian blood, its ward, instituted this action against the Board of County Commissioners of Tulsa County, Okl., for the recovery of taxes assessed against land which had been allotted to the Indian for her homestead by reason of her being enrolled as a member of the Cherokee Tribe.

The facts in the case were stipulated, to the effect that Pansy B. Hawk, nee Lloyd, is a Cherokee Indian allottee of ⅛

Indian blood, that she was enrolled opposite Roll No. 12,508, and was allotted the land as her homestead allotment, which was particularly described.

The allotment was by virtue of the Act of Congress of July 1, 1902 (32 Stat. 716), providing for the allotment of the lands of the Cherokee Tribe of Indians in severalty. Section 13 of the act provides as follows:.

"During the time said homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him."

It was further agreed that by the provisions of the above Act of Congress, the land allotted to Pansy B. Hawk, nee Lloyd, as her homestead allotment, was expressly exempted from taxes so long as the title thereto remained in the allottee, and that the allottee owned and held the land so allotted to her during the periods for which the lands were assessed for taxation and taxes paid. The agreed facts further disclose that for the years 1910, 1911, 1923, 1924, 1926, and 1927 and 1928, and while the title to the land allotted as the homestead was in the name of Pansy B. Hawk, nee Lloyd, the county assessor of Tulsa county, Okl., assessed the land for general and special taxes and extended the same upon the tax rolls of Tulsa county, and thereafter delivered the tax rolls, with warrants for collection thereon, to the treasurer of Tulsa county; that taxes in the sum of $3,426.61, together with penalties, costs, and redemption fees, were collected by the county treasurer of Tulsa county, although the allottee protested and objected to payment of the taxes, but filed no written protest to the payment. It was further stipulated that during the times mentioned the county treasurer of Tulsa county offered portions of the land of the allottee for sale to satisfy the taxes so collected, and the said Pansy B. Hawk, nee Lloyd, was compelled to and did redeem same. No claim was ever filed by or on behalf of Pansy B. Hawk, nee Lloyd, for refund of the taxes paid, and the allottee never at any time applied to the Board of County Commissioners of Tulsa County, or the Equalization Board, for the purpose of having the parcels of land stricken from the tax rolls of Tulsa county.

The defendant urges limitations as a defense. The limitations relied upon are those provided in section 101, O.S.1931 (12

Okl.St.Ann. § 95), and section 7458, O.S. 1931 (19 Okl.St.Ann. § 247), as well as section 2 of the Congressional Act of April 12, 1926 (44 Stat. 240). The defendant contends that each of the above statutory limitations is a complete bar to a recovery in this action. The plaintiff urges that the limitations provided in the Oklahoma statutes have no application in the instant case, and that the Congressional Act is not applicable to actions for the recovery of money, but applies only in actions involving real estate.

■ The allottee is a member of the Cherokee Tribe of ⅛ Indian blood. The agreement providing for the allotment of land to her, as well as other members of the Cherokee Tribe, provided that the homestead allotment shall be nontaxable during the time it is held by the allottee. The allottee held title to the land during the times complained of in the action, and during those years the land was nontaxable. By reason of the relation of the United States to its Indian wards, this suit is maintainable by the plaintiff. See Board of Commissioners of Caddo County, Oklahoma, v. United States (C.C.A.) 87 F.(2d) 55; United States v. Dewey County, South Dakota (D.C.) 14 F.(2d) 784; United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532; United States v. Chehalis County (D.C.) 217 F. 281. None of the cited cases involve a member of the Cherokee Tribe of Indians of ⅛ Indian blood, but the Congressional Act providing for allotment of the lands makes no requirement for the quantum of Indian blood of an allottee in order to enjoy freedom from taxation, but expressly provides that such exemption shall exist during the time the homestead is held by the allottee. She was thus given a vested property right by the Congressional Act. See Carpenter v. Shaw, 280 U.S. 363, 50 S.Ct. 121, 74 L. Ed. 478; English v. Richardson, 224 U.S. 680, 32 S.Ct. 571, 56 L.Ed. 949; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; United States v. Benewah County (C. C.A.) 290 F. 628, 629; Morrow v. United States (C.C.A.) 243 F. 854; Board of Commissioners of Caddo County, Oklahoma, v. United States (C.C.A.) 87 F.(2d) 55.

■ Section 101, O.S.1931 (12 Okl.St. Ann. § 95), provides that actions upon contract, express and implied, not in writing, and actions upon a liability created by statute other than a forfeiture or penalty,

shall be brought within three years. Section 7458, O.S.1931 (19 Okl.St.Ann. § 247), provides that no account against the county shall be allowed unless presented within two years after the same accrued, making provision that in case of disability time is extended to one year after the disability is removed. These statutes are relied upon for defense. This contention has been decided adversely to the defendant herein in so many controlling decisions that it is unnecessary to comment upon it. Suffice it to say that the statute of limitations does not apply where the United States is a party, and this action was instituted by the government in its governmental capacity on behalf of its ward. The United States Supreme Court and the Circuit Court of Appeals for the Tenth Circuit have held that the statute of limitations in Oklahoma cannot bar a recovery in such cases, See United States v. Minnesota, 270 U.S. 181, 46 S.Ct. 298, 301, 70 L. Ed. 539, wherein Mr. Justice Van Devanter stated:

"And it also is settled that state statutes of limitation neither bind nor have any application to the United States, when suing to enforce a public right or to protect interests of its Indian wards."

See, also, United States v. Nashville, etc., Railway Co., 118 U.S. 120, 6 S.Ct. 1006, 30 L.Ed. 81, 83; United States v. Rickert, 188 U.S. 432, 436, 23 S.Ct. 478, 47 L.Ed. 532; Cramer v. United States, 261 U. S. 219, 43 S.Ct. 342, 67 L.Ed. 622; Board of Commissioners of Caddo County, Oklahoma, v. United States (C.C.A.) 87 F.(2d) 55.

The only remaining question for consideration is the defense interposed of the Congressional Act of April 12, 1926, section 2 of which (44 Stat. 240) provides that:

"The statutes of limitations of the State of Oklahoma are hereby made and declared to be applicable to and shall have full force and effect against all restricted Indians of the Five Civilized Tribes, and against the heirs or grantees of any such Indians, and against all rights and causes of action heretofore accrued or hereafter accruing to any such Indians or their heirs or grantees, to the same extent and effect and in the same manner as in the case of any other citizen of the State of Oklahoma, and may be pleaded in bar of any action brought by or on behalf of any such Indian, his or her heirs or grantees, either in his own behalf or by the Government of the United States, or by any other party for his or her benefit, to the same extent as though such action were brought by or on behalf of any other citizen of said State: Provided, That no cause of action which heretofore shall have accrued to any such Indian shall be barred prior to the expiration of a period of two years from and after the approval of this Act, even though the full statutory period of limitation shall already have run or shall expire during said two years' period, and any such restricted Indian, if competent to sue, or his guardian, or the United States in his behalf, may sue upon any such cause of action during such two years' period free from any bar of the statutes of limitations."

It is urged by the government that this statute applies only in actions relating to land titles, and has no force or effect in actions for the recovery of money. The particular question does not seem to have had the consideration of the appellate courts, because no authority has been submitted involving the question. The only cases of appellate courts involving the above Congressional Act which have been presented are those concerned with titles to real estate. Tomlin v. Roberts, 126 Okl. 165, 258 P. 1041; Kanuebbe v. McCuistion, 168 Okl. 165, 33 P.(2d) 1088; Stewart v. Keyes, 295 U.S. 403, 55 S.Ct. 807, 79 L.Ed. 1507. There is nothing in any of the cited cases supra to indicate that the effect of the Congressional Act is limited to statutes involving titles to real estate, but those cases consider only cases involving real estate. It, therefore, becomes necessary to attempt to determine the intention of Congress in enacting the statute. The act (section 1) amends section 9 of the Act of Congress of May 27, 1908 (35 Stat. 315), and provides for the removal of restrictions on certain Indian lands. The second section of the act makes the statute of limitations of the state of Oklahoma applicable to suits instituted by Indians, or to suits instituted for and on their behalves; and the third section provides for notice to be served on the superintendent of the five civilized tribes in suits in federal or state courts affecting restricted allotments. It should be observed that the act dealt with lands of Indians, except section 2 thereof, which provides limitations and does not expressly restrict such limitations to cases involving titles to lands. The report from the

Committee on Indian Affairs upon the Congressional Act clearly shows that the bill was intended to apply only to actions involving real estate.[1]

[1] Mr. Hastings, from the Committee on Indian Affairs, submitted the following

### Report
#### (To accompany H. R. 4761)

The Committee on Indian Affairs, to whom was referred the bill (H. R. 4761) to amend section 9 of the act of May 27, 1908 (Thirty-fifth Statutes at Large, page 312), and putting in force, in reference to suits involving Indian titles, the statutes of limitations of the State of Oklahoma, and providing for the United States to join certain actions, and for making judgments binding on all parties, and for other purposes, having considered the same, report thereon with a recommendation that it do pass with the following amendments: * * *

This bill was introduced in the later part of the last session of the Sixty-eighth Congress and extended hearings were held on it, but no report was made, and the same was reintroduced in the present session of Congress. It contains three sections.

The first section amends section 9 of the act of May 27, 1908, and deals with the approval of conveyances made by full-blood heirs of deceased allottees of the Five Civilized Tribes. It is for the purpose of stabilizing titles and will be of benefit to all land owners in eastern Oklahoma, Indian and white, in that the title of land of deceased allottees may be made more definite and certain, and there will be less difficulty with reference to same.

Section 2 extends the statute of limitations to the restricted Indians of the Five Civilized Tribes. It does not affect any pending lawsuit, and it gives two years additional time in the event the statute of limitation is about to run within which to institute any suit wherein the interests of a restricted Indian of the Five Civilized Tribes is involved.

Section 3 provides only where the interest of a restricted Indian of the Five Civilized Tribes is being litigated in the State courts that service may be had upon the Government, and the Government is given the right to choose the forum in which the suit may be tried and may transfer such case to the United States District Court upon motion in the event that the Government chooses to do so. If said case is not transferred the decision of the court is final, and it could prevent a new suit from being instituted for and on behalf of a restricted Indian thereafter by the Government.

The entire bill is designed to stabilize titles in eastern Oklahoma and it is expected that it will add value to these lands. The bill has the approval of the Secretary of the Interior as evidenced by the report which is attached hereto and made a part of this report.

The Secretary of the Interior, Washington, February 16, 1926.
Hon. Scott Leavitt,
Chairman Committee on Indian Affairs,
House of Representatives.

My dear Mr. Leavitt: Attention is respectively invited to your request for report on H. R. 4761, Sixty-ninth Congress, being a bill designed to amend section 9 of the act of May 27, 1908 (35 Stat. 312), to quiet titles where Indian lands in Oklahoma were or are involved, and for other purposes.

Before discussing the provisions of the pending measure in detail it may be well to point out briefly some of the conditions this bill is designed to remedy. The act of May 27, 1908, referred to deals exclusively with allottees of the Five Civilized Tribes in Oklahoma and has been in practical operation for nearly 18 years. Under its terms such limited supervision as is now exercised over these Indians by this department will terminate April 26, 1931—that is, about five years hence. By section 9 of the act of 1908 it is provided that the death of any allottee of the Five Civilized Tribes shall remove all restrictions against alienation of such allottee's land, except that no conveyance by any full-blood Indian heir of any interest in such lands shall be valid unless approved by the county court "having jurisdiction of the settlement of the estate of said deceased allottee." The language specifically quoted has proven fruitful of considerable confusion, misunderstanding, and even costly litigation, particularly with respect to the county court having jurisdiction under the law as it now reads. Doubtless this is due in large measure to the nomadic habits of the Indian, roaming around from county to county regardless of the county in which his allotment may be situated. At death considerable misunderstanding may naturally arise as to where the allottee maintained his last "legal residence," and hence which county court has jurisdiction over "the settlement of his estate." This may even be far removed from the county in which his allotted land lie. Conveyances by full-blood heirs, however, have been approved by various county courts in

The member of Congress introducing the bill stated that the bill was designed to stabilize land titles in Eastern Oklahoma, and that it was expected that such an act would add value to the lands. The Act was reported and discussed by the Committee as one referring to suits involving Indian titles, the statutes of limitation of the state of Oklahoma, and providing for the United States to join such actions. It was based entirely upon a consideration of Indian titles, and, it is my opinion, that it was the intention of Congress that the limitation provision of the act is applicable only to actions involving Indian land titles. The instant case does not pertain to land titles, but merely seeks a recovery of taxes paid upon lands which had been illegally assessed.

I conclude that the Act of April 12, 1926, does not apply in this case. Decree may be entered for plaintiff.

large number. Frequently the lands so conveyed have subsequently proven very valuable for oil, gas, or other purposes, and in numerous instances the title to such land has been attacked on the ground that the conveyance had not been approved by the proper county court and was therefore invalid. Bona fide purchasers of such land, their assignees, lessees, etc., have repeatedly been subjected to expensive lawsuits, claims, and demands for settlement from claimants seeking to attack the validity of the title so resting in the present owner or owners.

Admittedly innocent purchasers for value, particularly where the consideration paid was full or adequate, are entitled to relief from technical or other unwarranted attacks against their title. On the other hand, in so far as conveyances under section 9 of the Act of May 27, 1908, are concerned, those conveyances not being subject to approval by this department, we are here necessarily dealing with transactions regarding the real merits or demerits of which this department is practically without knowledge. The bill under discussion, in addition to validating titles in cases where undoubtedly relief should be had might also validate titles in some cases where, if the true situation were known, the withholding of such action would clearly be justified. In other words, in order to grant relief in deserving cases, such legislation may at the same time create machinery whereby titles without merit would also be validated. Manifestly this would not be to the best interest of the Indians to the extent that those titles that should not be validated are validated, if there be such titles.

Very truly yours,
Hubert Work.