IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

―――――――――

**SOUTH POINT ENERGY CENTER LLC,**
*Plaintiff/Appellant,*


*v.*


**ARIZONA DEPARTMENT OF REVENUE, ET AL.,**
*Defendants/Appellees.*

―――――――――

No. CV-21-0130-PR
**Filed April 26, 2022**

―――――――――

Appeal from the Arizona Tax Court
The Honorable Christopher T. Whitten, Judge
Nos. TX2013-000522, TX2014-000451, TX2015-000850,
TX2016-001228, TX2017-001744, TX2018-000019,
TX2019-000086 (Consolidated)

―――――――――

Opinion of the Court of Appeals, Division One
251 Ariz. 263 (App. 2021)

**VACATED IN PART AND REMANDED**

―――――――――


COUNSEL:

Bennett Evan Cooper (argued), Vail C. Cloar, Dickinson Wright PLLC, Phoenix; Pat Derdenger, Karen Lowell, Lewis Roca Rothgerber Christie LLP, Phoenix, Attorneys for South Point Energy Center LLC

Cameron C. Artigue (argued), Camila Alarcon, Christopher L. Hering, Gammage & Burnham, P.L.C., Phoenix, Attorneys for Arizona Department of Revenue, et al.

Charles W. Galbraith, Jenner and Block LLP, Washington, D.C.; Verrin T.

Kewenvoyouma, Christopher Love, Kewenvoyouma Law, PLLC, Tempe,
Attorneys for Amici Curiae Fort Mojave Indian Tribe, the Navajo Nation,
the Gila River Indian Community, Gila River Indian Community Utility
Authority, the Inter-Tribal Association of Arizona, and the National
Congress of American Indians

James M. Susa, DeConcini McDonald Yetwin & Lacy, P.C., Tucson,
Attorneys for Amicus Curiae County Supervisors Association of Arizona
and the Arizona Association of Counties

——————————

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which
CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, LOPEZ, BEENE,
MONTGOMERY, and KING joined.

——————————

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

**¶1**        The issue here is whether the Indian Reorganization Act of
1934 (the "Act") expressly preempts Mohave County's ad valorem property
tax on a power plant owned by non-Indian lessees of land purportedly
acquired by the federal government under the Act and held in trust for the
benefit of an Indian tribe.   We hold the Act does not expressly preempt
this tax.

## BACKGROUND

**¶2**        In 1999, Calpine Construction Finance Co. ("Calpine"), a non-
Indian-owned entity, leased 320 acres of undeveloped land on a long-term
basis from the Fort Mojave Indian Tribe (the "Tribe") to construct and
operate an electric power generating plant (the "Plant") on reservation
lands.   The Plant, which began operating in 2001, is a "merchant plant"
that sells electrical energy to public and private utility companies for resale
and redistribution to end-users.   It does not supply electrical energy to the
Tribe or to any person or entity located on the reservation.   The Tribe did
not finance the Plant's construction and does not contribute any operating
funds.

**¶3**        After the Plant was built, Mohave County assessed ad valorem property taxes against the Plant based on valuations determined by the Arizona Department of Revenue ("ADOR").   *See* Ariz. Const. art. 9, § 2(13) ("All property in the state not exempt under the laws of the United States or under this constitution or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law."); A.R.S. § 42-11002 (to same effect).   ADOR assessed only the value of the Plant itself and the personal property used to operate it; ADOR did not assess the value of the underlying land.

**¶4**        Calpine paid the taxes and unsuccessfully sued for a refund, arguing the Tribe, as lessor, owned all improvements to the leased property, thereby exempting the Plant from state taxation pursuant to federal law.   *See Calpine Constr. Fin. Co. v. Ariz. Dep't of Revenue*, 221 Ariz. 244, 249 ¶ 22 (App. 2009); *see also Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110 (1998) ("State and local governments may not tax Indian reservation land 'absent cession of jurisdiction or other federal statutes permitting it.'" (quoting *County of Yakima v. Confederated Tribes & Bands of Yakima Nation*, 502 U.S. 251, 258 (1992))).   In the ensuing appeal, the court of appeals acknowledged the general rule that a lessor owns all real property improvements made by a lessee but concluded the parties' lease varied that rule by providing that Calpine owns all improvements. *Calpine Constr.*, 221 Ariz. at 248 ¶¶ 16–17.   Consequently, the court affirmed the tax court's judgment that Calpine was liable for property taxes based on the value of the Plant and related personal property.   *See id.* at 246 ¶ 1.

**¶5**        After a series of transactions involving Calpine and several of its related entities, the Tribe's land and the Plant were sublet to South Point Energy Center LLC ("South Point"), another Calpine-related entity, with the Tribe's consent and approval by the Bureau of Indian Affairs (the "BIA").   In 2012, the Tribe and Calpine's successor-lessees, which we include in our references to "South Point" for convenience, executed an amended lease, which remained in place during this lawsuit.   Among other things, the amended lease provides that no partnership exists between the Tribe and South Point.   It further reaffirms that the Plant and "all [i]mprovements and associated materials, supplies, and equipment" are "owned and controlled" by South Point, and that at the expiration of the lease, South Point must remove all above-ground real property improvements and personal property, excepting roads and foundations.

**¶6** The amended lease contemplates that ad valorem property taxes may be assessed on the Plant. The lease requires South Point to timely pay all taxes levied by any governmental entity to prevent imposition of any liens and to hold the Tribe harmless against any liens that are imposed. The BIA approved the amended lease.

**¶7** South Point initiated these consolidated lawsuits seeking a refund of payments for property taxes imposed from 2010 to 2018, to the extent they were based on valuations of the Plant. *See* A.R.S. § 42-11005 (authorizing suit to recover illegally levied, assessed, or collected taxes). South Point does not challenge the tax assessments based on ownership of the Plant, as Calpine did in its earlier lawsuit. Instead, South Point argues that § 5 of the Act, 25 U.S.C. § 5108, expressly preempts states from imposing property taxes on any real property improvements, regardless of ownership, located on land held in trust by the federal government for the benefit of Indian tribes or individual Indians. Alternatively, South Point argues that application of a balancing test announced in *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), evidences Congress's implicit intent to preempt taxing the Plant.

**¶8** The tax court rejected both of South Point's arguments and granted summary judgment for Mohave County and ADOR (collectively, the "County"). The court of appeals reversed, reasoning that § 5 of the Act expressly and categorically exempts permanent improvements on the Tribe's land from state taxation regardless of ownership. *S. Point Energy Ctr. LLC v. Ariz. Dep't of Revenue*, 251 Ariz. 263, 269 ¶ 30 (App. 2021). It remanded for the tax court to determine which, if any, of the assets making up the Plant constitute the tax-exempt permanent improvements. *Id.* The court did not itself apply the balancing test under *Bracker* but instead instructed the tax court to do so in considering whether property taxes on the Plant's impermanent assets were taxable. *Id.*

**¶9** We granted review to decide whether § 5 of the Act expressly preempts taxing permanent improvements constructed on tribal lands acquired under that section when those improvements are owned by non-Indians, an issue of statewide importance.

4

**DISCUSSION**

**I.**

**¶10** We review the tax court's entry of summary judgment de novo, viewing the facts in the light most favorable to South Point as the nonmoving party. *Dinsmoor v. City of Phoenix*, 251 Ariz. 370, 373 ¶ 13 (2021). We will affirm if there is no genuine dispute of material fact and the State is entitled to judgment as a matter of law. *Id.*; Ariz. R. Civ. P. 56(a). We review the prior courts' preemption decisions and their interpretation of § 5 of the Act de novo as issues of law. *See Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 504 ¶ 7 (2018) (preemption); *Brenda D. v. Dep't of Child Safety*, 243 Ariz. 437, 442 ¶ 15 (2018) (statutory interpretation).

**II.**

**A.**

**¶11** The Supremacy Clause of the United States Constitution makes valid federal laws predominate over conflicting state laws. *See* U.S. Const. art. 6, cl. 2. Within constitutional limits, Congress may generally preempt application of state law in a few ways, including "by so stating in express terms," which is known as "express preemption." *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04 (1983) (describing different types of preemption). In deciding whether state laws apply to non-Indian activities conducted on an Indian reservation, the Court in *Bracker* provided an additional pathway for finding federal preemption. 448 U.S. at 144–45. A court faced with a preemption challenge in that circumstance, absent express preemption, should make "a particularized inquiry into the nature of the state, federal, and tribal interests at stake . . . to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.* If so, the state law is impliedly preempted. *See id.*; *see also Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 176–77 (1989) ("It bears emphasis that although congressional silence no longer entails a broad-based immunity from taxation for private parties doing business with Indian tribes, federal preemption is not limited to cases in which Congress has expressly—as compared to impliedly—preempted the state activity.").

**¶12** The only issue before us is whether § 5 of the Act expressly preempts application of Arizona's ad valorem tax laws against the Plant.

5

*See Confederated Tribes of Chehalis Rsrv. v. Thurston Cnty. Bd. of Equalization*, 724 F.3d 1153, 1159 (9th Cir. 2013) (stating that when § 5 of the Act applies to preempt taxation, there is no need to consider implied preemption under *Bracker*).

**B.**

¶13        Section 5 of the Act provides in relevant part:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.
>
> . . . .
>
> Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 et seq.) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, **and such lands or rights shall be exempt from State and local taxation**.

25 U.S.C. § 5108 (emphasis added).   South Point argues that the above-emphasized language categorically exempts the Plant from the County's property tax regardless of ownership.   The County asserts that because the Plant is not owned by the United States in trust for the Tribe or for individual Indians, the Plant is not included in "such lands or rights" exempt from tax under § 5.

¶14        Our primary goal in interpreting § 5 is to determine and give effect to Congress's intent.   *See Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 570 ¶ 14 (2008).   We read words in context and effectuate the plain meaning of § 5 unless doing so would be absurd.   *See Welch v. Cochise Cnty. Bd. of Supervisors*, 251 Ariz. 519, 523 ¶ 11 (2021).   If the language is ambiguous, we consider secondary interpretive principles, such as the Act's subject matter, history, and purpose, and the consequences of differing interpretations.   *Id.*

¶15        We start with § 5's plain language.   The provision exempts "such lands or rights" from state and local taxation.   § 5108.   "Such lands or rights" are identified as "any interest in lands, water rights, or surface rights to lands" acquired by the Secretary of the Interior "for the purpose of providing land for Indians" and titled "in the name of the United States in trust for [an] Indian tribe or [an] individual Indian."   *Id.*   These "lands or rights" can be located "within or without existing reservations."   *Id.* Thus, to fall under § 5's tax exemption, the Plant must be (1) an "interest in lands, water rights, or surface rights to lands," (2) acquired by the Secretary of the Interior pursuant to § 5, and (3) titled "in the name of the United States in trust for the Indian tribe or [an] individual Indian."   *See id.*   The primary issue here is whether the Plant is included within the federal government's ownership rights, and thus the Tribe's beneficial rights, in the land underlying the Plant.   If it is, and § 5's additional requirements are satisfied, the Plant is tax exempt.

¶16        The Act itself does not delineate the rights included in the federal government's ownership of land under § 5.   According to the BIA, those rights include "any interests, benefits, and rights inherent in the ownership of the real property."   25 C.F.R. § 150.2.   As acknowledged in *Calpine Construction*, such rights generally include ownership of permanent improvements constructed by a tenant on leased property.   221 Ariz. at 248 ¶ 16; *see also Cutter Aviation, Inc. v. Ariz. Dep't of Revenue*, 191 Ariz. 485, 492 (App. 1997) (recognizing that generally "a permanent structure placed upon and attached to the realty by a tenant is real property belonging to the lessor").   This general rule does not apply when, as here, the lease provides that the tenant owns the permanent improvements.   *See Calpine Constr.*, 221 Ariz. at 248 ¶¶ 16–17; *Cutter Aviation*, 191 Ariz. at 492.   The BIA recognizes this exception as applying to leases of land owned by the federal government pursuant to § 5.   25 C.F.R. § 162.415(a) ("A business lease must specify who will own any permanent improvements the lessee constructs during the lease term and may specify under what conditions, if any, permanent improvements the lessee constructs may be conveyed to the Indian landowners during the lease term.").

¶17        It is settled that South Point, not the federal government, owns the Plant.   *Calpine Constr.*, 221 Ariz. at 248 ¶ 17.   Based on this fact alone, § 5 seemingly does not exempt the Plant from the County's property taxes because the land owned by the United States in trust for the Tribe does not include the Plant.   *See* § 5108.   As South Point notes, however, the Supreme Court expansively applied § 5 in *Mescalero Apache Tribe v. Jones*,

411 U.S. 145 (1973), to exempt a state tax imposed on a tribal entity for using permanent improvements it constructed and owned on land leased from the federal government. In doing so, the Court relied on *United States v. Rickert*, 188 U.S. 432, 441–43 (1903), a pre-Act case, which disallowed a state property tax on permanent improvements constructed by Indians on land held in trust for them by the federal government. We therefore consider these cases in determining whether § 5 broadly applies to categorically exempt all permanent improvements affixed to land owned by the federal government in trust for Indians. *See James v. City of Boise*, 577 U.S. 306, 307 (2016) (concluding that state and federal courts are bound by the Supreme Court's interpretation of federal law); *Weatherford ex rel. Michael L. v. State*, 206 Ariz. 529, 532 ¶ 8 (2003) (acknowledging that a Supreme Court decision on a substantive federal issue binds the state courts on that issue).

**¶18** The Court in *Rickert* addressed whether a South Dakota county could assess and impose property taxes on permanent improvements and personal property owned by Indians and used in cultivating lands allotted them under the now-defunct General Allotment (Dawes) Act of 1887, ch. 119, 24 Stat. 388 (codified as amended in scattered sections of 25 U.S.C.). 188 U.S. at 432–33. That act authorized the federal government to allot agricultural and grazing lands on Indian reservations to individual Indians. General Allotment Act, § 1. Upon allotment, the land was owned by the government in trust for the sole use and benefit of allottee Indians for twenty-five years, at which time the government would convey fee simple title to them and discharge the trust. *Id.* § 5. After all Indians were allotted reservation lands, any remaining lands could be sold to the United States, which could then open them to non-Indians for homesteading. *Id.* "[T]he allotment process was designed to assimilate Indians into the larger society," the theory being that by the time they took fee title to the lands, the Indians would have adapted to the mainstream western agricultural economy. Philip P. Frickey, *A Common Law for Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers*, 109 Yale L.J. 1, 14–15 (1999).

**¶19** The *Rickert* Court first concluded that the South Dakota county lacked authority "to assess and tax the lands in question until at least the fee was conveyed to the Indians." 188 U.S. at 437. It characterized the allotted trust lands as "an instrumentality employed by the United States" to benefit Indians and reasoned that permitting taxation would defeat the government's statutory obligation to convey the land in fee to allottees free of any encumbrances, including tax liens. *Id.* at 437–38.

¶20     The Court applied similar reasoning in holding the county could not assess and tax the Indians' permanent improvements or personal property (cattle, horses, and the like), the latter having been purchased with federal funds to fulfill the government's goal of aiding the Indians in successfully cultivating the allotted lands. *See id.* at 441–45. The Court stated that allotting lands to individual Indians evidenced Congress's expectation that those lands "would be improved and cultivated by the allottee," and concluded "that object would be defeated if the improvements [and personal property] could be assessed and sold for taxes." *Id.* at 442. Responding to the county's suggestion that the government's only interest was conveying the allotted land free from encumbrance after twenty-five years and not the improvements or personalty, the Court explained that the government owed a duty of "care and protection" to the Indians that transcended its contractual obligation. *Id.* at 442–43. "The government would not adequately discharge its duty to these people if it placed its engagements with them upon the basis merely of contract, and failed to exercise any power it possessed to protect them in the possession of such improvements and personal property as were necessary to the enjoyment of the land held in trust for them." *Id.* at 443.

¶21     After *Rickert*, and by the 1920s, allotment proved disastrous for Indian tribes and individual Indians. *See* Frickey, *supra*, at 15 (describing the loss of "huge amounts of Indian land . . . through sales and tax foreclosures" after the Indians became fee owners of the allotted lands); L. Scott Gould, *The Consent Paradigm: Tribal Sovereignty at the Millennium*, 96 Colum. L. Rev. 809, 829 (1996) ("Although the [General Allotment Act] was ostensibly intended to reduce poverty among Indians, it had the opposite effect."). Confronting this failure, Congress passed the Act in 1934 "to rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism" by giving Indian tribes and Indians control of their own property and affairs. *See Mescalero*, 411 U.S. at 152 (quoting H.R. Rep. No. 73-1804, at 6 (1934)). In addition to authorizing the Secretary of the Interior to acquire lands, water rights, or surface rights in trust for Indians, the Act discontinued the allotment program and strengthened means for Indian tribes and Indians to self-govern and perpetuate their cultures. *See* Indian Reorganization (Wheeler-Howard) Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §§ 461–479) (describing the Act as one "[t]o conserve and develop Indian lands and resources; to extend to Indians the right to form business and other organizations; to establish a credit system for

Indians; to grant certain rights of home rule to Indians; to provide for vocational education for Indians; and for other purposes").

**¶22**        This brings us to *Mescalero*. The Mescalero Apache Tribe owned and operated an off-reservation ski resort in New Mexico, which the tribe developed under the Act. *Mescalero*, 411 U.S. at 146. Specifically, the United States Forest Service leased land to the tribe, and the federal government loaned the tribe money to build and equip the resort.[1]  *See id.* New Mexico imposed both a sales tax on the resort's gross receipts and a use tax for the tribe's use of two ski lifts operating at the resort.  *See id.* at 146–47.  In the tribe's subsequent challenge under §5 of the Act, then codified at 25 U.S.C. §465, the Court upheld the sales tax, reasoning that "[o]n its face, the statute exempts land and rights in land, not income derived from its use."  *Id.* at 155.  The Court acknowledged that an exemption for sales tax is arguably supported by the context and purposes of §5 but concluded that "absent clear statutory guidance, courts ordinarily will not imply tax exemptions."  *Id.* at 155–56; *see also id.* at 156 (stating that a tax exemption affecting Indians "can not [sic] rest on dubious inferences" but must be expressed by Congress "in plain words" (quoting *Okla. Tax Comm'n v. United States*, 319 U.S. 598, 607 (1943))).

**¶23**        The Court reached a contrary conclusion regarding the use tax, which taxed the tribe's use of the ski lifts and was assessed based on the out-of-state purchase price for the materials used to construct the lifts. *See id.* at 147, 158.  The Court initially noted the ski lifts had been permanently attached to the land and, citing *Rickert*, concluded they "would certainly be immune from the State's ad valorem property tax." *Id.* at 158.  It found that the same immunity extended to the use tax, reasoning that use of land "is among the 'bundle of privileges that make up property or ownership' of property and, in this sense, at least, a tax upon 'use' is a tax upon the property itself." *Id.* (quoting *Henneford v. Silas Mason Co.*, 300 U.S. 577, 582 (1937)).  And because "use of permanent improvements upon land is so intimately connected with use of the land itself," the Court concluded that §5's exemption applied to the use tax.  *Id.*

---

[1] The Court acknowledged that "[t]he ski resort land was not technically 'acquired' 'in trust for the Indian tribe.'"  *Mescalero*, 411 U.S. at 155 n.11. It nevertheless concluded that §5 applied to the tribe's interest in the land as "it would have been meaningless for the United States, which already had title to the forest, to convey title to itself for the use of the Tribe."  *Id.*

¶24    South Point argues *Mescalero* categorically bars the County's assessment of property taxes on the Plant under § 5 regardless of South Point's ownership of the facility.   It asserts that, as with use of the ski lifts in *Mescalero*, the Plant is included within the "bundle of privileges" comprising the Tribe's beneficial ownership of the land underlying the Plant, and taxing the Plant necessarily, and impermissibly, taxes that "bundle."   The County counters *Mescalero* had "nothing to do with the taxation of non-Indian property," and we should therefore apply the plain language of § 5 to find it does not exempt the Plant from the County's tax.

¶25    We do not read *Mescalero* as applying § 5 to exempt taxation of non-Indian-owned permanent improvements.   First, the Court's analysis solely concerned tribal property and tribal activities.   A tribal-owned entity owned and used the ski lifts, and New Mexico assessed the use taxes "against the [Mescalero Apache] Tribe."   *Id.* at 147.   The Court did not address whether New Mexico could impose a use tax on non-Indians using property at the ski resort or whether it could assess a property tax on non-Indian-owned property affixed to the resort land.

¶26    Second, *Rickert*, which the *Mescalero* Court relied on for its use-tax analysis, turned on the property owners' status as Indians. Specifically, *Rickert* prohibited imposition of property taxes on Indian-owned permanent improvements and personal property on allotted lands to avoid taxing "an instrumentality" employed by the federal government to benefit and protect allottee Indians in improving and cultivating trust lands.   188 U.S. at 437, 442–44; *cf. M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436–37 (1819) (disallowing a state-levied tax on the operations of a national bank that, in violation of the Supremacy Clause, interfered with the federal government's execution of powers).   Taxing permanent improvements owned by non-Indians would not affect those objectives. Thus, it does not necessarily follow that *Rickert*, as applied in *Mescalero* to interpret § 5, exempts non-Indian-owned property from state taxation.

¶27    Third, before *Mescalero*, the Court had refused to extend *Rickert*'s "federal instrumentality" analysis to exempt state property taxes and state excise taxes for non-Indian lessees of Indian lands if those taxes were imposed on similarly situated persons.   *See Okla. Tax Comm'n v. Tex. Co.*, 336 U.S. 342, 343, 366–67 (1949) (holding that a non-Indian lessee of mineral rights on lands allotted under the General Allotment Act was not immunized by the Supremacy Clause from state taxes levied against both the lessee's property used in producing petroleum and on the oil and gas

produced in the tax year); *Taber v. Indian Territory Illuminating Oil Co.*, 300 U.S. 1, 3–5 (1937) (upholding a state's non-discriminatory ad valorem property taxes on dwelling, tool house, garage, and equipment used by non-Indian lessee of restricted Indian lands to produce oil and gas). The Court in *Oklahoma Tax Commission v. Texas Co.* concluded that "whether immunity shall be extended in situations like these is essentially legislative in character," and because Congress had not created such immunity by affirmative action, the taxes there were validly levied. 336 U.S. at 365–66.

¶28        The *Mescalero* Court recognized that *Oklahoma Tax Commission v. Texas Co.* and other cases had "cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation." 411 U.S. at 150. In determining § 5's applicability, the Court also relied on *Oklahoma Tax Commission v. Texas Co.* in stating that "[l]essees of otherwise exempt Indian lands are also subject to state taxation." *Id.* at 157. In light of this pronouncement, if the Court had interpreted § 5 as also exempting permanent improvements owned by non-Indian lessees from state and local taxation, we would expect the Court to have said so rather than leaving confusion in its wake. It did not.

¶29        Fourth, applying *Mescalero*'s holding outside the context of Indian-owned property would ignore § 5's requirement that the federal government own the "lands or rights" in trust for an Indian tribe or for individual Indians. *See* § 5108. *Mescalero* included permanent improvements and their use as among the "bundle of privileges" making up property or property ownership because such improvements are "intimately connected with use of the land itself." 411 U.S. at 158. But when ownership of permanent improvements is purposefully plucked from that bundle, as occurred here, it loses that intimate connection. In that circumstance, the Indian beneficiary has no possessory or use interest in the permanent improvements, and the federal government's "lands or rights" do not include those improvements.

¶30        *Chehalis* does not persuade us that *Mescalero* interpreted § 5 as imposing the categorical bar urged by South Point. There, the Ninth Circuit considered whether § 5 preempted a county tax on a resort, conference center, and water park owned by a limited liability company and built on land held in trust by the United States for the Confederated Tribes of Chehalis Reservation. 724 F.3d at 1154–55. The tribe, which formed the company and owned an undivided 51% interest in it, leased the

land to the company for twenty-five years. *Id.* at 1154. Per the lease, the tribe would take ownership of all buildings and other improvements at the end of the leasehold term. *Id.* at 1154–55.

¶31 The Ninth Circuit found *Mescalero* dispositive and held the county was barred from taxing the company's permanent improvements. *See id.* at 1157–58. In its concluding paragraph, the court stated, "*Mescalero* sets forth the simple rule that [§ 5] preempts state and local taxes on permanent improvements built on non-reservation land owned by the United States and held in trust of an Indian tribe. *This is true without regard to the ownership of the improvements.*" *Id.* at 1159 (emphasis added). In isolation, this statement supports South Point's view of *Mescalero*. But the body of the opinion clarifies that § 5 preemption applies to permanent improvements regardless of the ownership vehicle a *tribe* uses to own the improvements. Specifically, the court rejected the county's argument that *Mescalero* was distinguishable because a private company rather than the Confederated Tribes of Chehalis Reservation itself owned the permanent improvements. *See id.* at 1157. The court characterized *Mescalero* as instructing that "the question of tax immunity cannot be made to turn on the particular form in which the [t]ribe chooses to conduct its business." *Id.* at 1156 (quoting *Mescalero*, 411 U.S. at 157 n.13). The court then concluded that "the [t]ribe's decision to give ownership of the [permanent improvements] to its limited liability company for the duration of the lease" was irrelevant. *Id.* at 1157. *Chehalis*, therefore, does not support applying *Mescalero* to exempt the tax against the Plant. Alternately, if the Ninth Circuit indeed intended the broader reading of *Mescalero* urged by South Point, we reject that reading for the reasons previously explained. *See supra* ¶¶ 25–29.

¶32 We are also unpersuaded that other federal authorities cited by South Point establish that § 5 preempts the County's tax on the Plant. In *Seminole Tribe of Florida v. Stranburg*, 799 F.3d 1324, 1326 (11th Cir. 2015), one issue was whether § 5 exempted a state tax on rents paid by a non-Indian lessee of food-court operations inside two Indian-owned casinos. Under Florida law, the tax was imposed for the "privilege [of engaging] in the business of renting, leasing, letting, or granting a license for the use of any real property," assessed against the lessee and collected by the landlord, which remitted the tax to the state. *Id.* (alteration in original) (quoting Fla. Stat. § 212.031(1)(a)). Relying heavily on *Mescalero*, the Eleventh Circuit concluded that § 5 preempted the rental tax. *Id.* at 1328–32. The court described *Mescalero* as "stand[ing] for the proposition

that [§ 5] precludes state taxation of that 'bundle of privileges that make up property or ownership of property.'" *Id.* at 1330 (quoting *Mescalero*, 411 U.S. at 158). After concluding that leasing property "is a fundamental privilege of property ownership," the court found that Florida's tax on that privilege was tantamount to the use tax at issue in *Mescalero* and similarly preempted. *Id.*

¶33 *Stranburg* did not apply *Mescalero*'s holding to taxing non-Indian-owned permanent improvements because the case did not involve taxing such improvements. Nevertheless, South Point seizes on *Stranburg*'s description of *Mescalero* as meaning § 5 preempts state and local taxes on privileges attending Indians' beneficial ownership of property, asserts the Tribe's ownership privileges include benefitting from South Point's "use of the land and any permanent improvements," and argues the tax here infringes those privileges and are therefore preempted under § 5. This is a leap too far. The County's property tax is not imposed on South Point's rental payments, so the tax does not burden the Tribe's use of its land as was the case in *Stranburg*. And as previously explained, the Tribe has no ownership interest in the Plant, so the tax could not infringe on it. *Cf. Okla. Tax Comm'n*, 336 U.S. at 353 (stating that the taxes there raised no issues regarding the immunity of Indian lands because "[t]here is no possibility that ultimate liability for the taxes may fall upon the owner of the land"). Thus, because the Tribe derives no benefit from the Plant, the tax cannot infringe on it.

¶34 South Point also asks us to give weight to a Department of Interior regulation concerning Indian land leases. *See Wade v. Ariz. State Ret. Sys.*, 241 Ariz. 559, 563 (2017) (acknowledging that absent legislative direction, the court will give weight to an agency's construction of the system it administers). Title 25, § 162.017(a) of the Code of Federal Regulations states that "[s]ubject only to applicable Federal law, permanent improvements on the leased land, without regard to ownership of those improvements, are not subject to any fee, tax, assessment, levy, or other charge imposed by any State or political subdivision of a State."

¶35 The regulation does not persuade us to interpret § 5 differently. First, the regulation itself cannot preempt the County's tax. *See Kansas v. Garcia*, 140 S. Ct. 791, 801 (2020) (stating preemption can arise only from "the Constitution itself or a valid statute enacted by Congress"). Second, Congress has provided direction on the exemption at issue by enacting § 5. We can ascertain that provision's meaning by applying

interpretive principles, and we have no need to defer to the Department of Interior's interpretation. *See Wade*, 241 Ariz. at 563 (recognizing the judiciary has final authority in interpreting statutes). Third, the regulation is "[s]ubject . . . to applicable Federal law," which includes § 5, the cases interpreting it, and *Bracker*. § 162.017(a). The Department of Interior has taken the position in other cases that "§ 162.017 has no legal effect at all," and the department is "agnostic" on whether any specific state tax is preempted. *Desert Water Agency v. U.S. Dep't of the Interior*, 849 F.3d 1250, 1254 (9th Cir. 2017). Instead, the regulation merely reflects the agency's view that when a *Bracker* analysis is conducted, "the federal and tribal interests at stake are strong enough to have a preemptive effect in the generality of cases." *See id.*; *see also Stranburg*, 799 F.3d at 1337–38 (declining to defer to § 162.017 and describing the preamble to the regulations as "outlin[ing] the *Bracker* balancing test and then appl[ying] it generally").

¶36 In sum, § 5 preempts state and local taxes imposed on land and rights acquired by the Secretary of the Interior and titled in the name of the United States in trust for Indian tribes or individual Indians. Ownership rights in land generally include permanent improvements affixed to that land by a lessee but not if the parties agree that the lessee owns those improvements. When that lessee is a non-Indian, § 5 does not preempt a state or locality from taxing the improvements. Neither *Mescalero* nor other federal authorities provides otherwise.

¶37 Here, South Point indisputably owns the Plant, and the property taxes fall solely on it and not the Tribe's land. Consequently, § 5 does not exempt the Plant from taxation, and the court of appeals erred by holding otherwise. Considering our decision, we need not address the County's additional argument that exemption does not apply because the Secretary of the Interior did not acquire the land underlying the Plant pursuant to § 5. Because the court of appeals did not address whether the tax court correctly ruled that the Plant is also not impliedly exempt from the County's tax under *Bracker*, we remand to the court of appeals to decide that issue. *See S. Point Energy Ctr.*, 251 Ariz. at 268 ¶ 24.

## CONCLUSION

**¶38**    For the foregoing reasons, we vacate the court of appeals' opinion ¶¶ 9–24 and the first sentence in ¶ 30.    We remand to the court of appeals to decide the remaining issue left undecided by that court.